Argued March 21, affirmed July 31, petition for rehearing
denied September 19, 1956

## STOUT *v.* MADDEN and WILLIAMS
300 P. 2d 461

*Thomas H. Tongue,* III, Portland, argued the cause for appellant. On the briefs were Hicks, Davis & Tongue, and Walden Stout, Portland.

*Howard K. Beebe,* Portland, argued the cause for respondent. With him on the brief were Maguire, Shields, Morrison & Bailey, Portland.

Before WARNER, Chief Justice, and TOOZE, ROSSMAN, LUSK, BRAND and PERRY, Justices.

PERRY, J.

This is an action by Lansing Stout against John R. Madden, dba Jolly John's, and Eddie Williams, to recover damages for personal injuries sustained by plaintiff in being run down and injured by an automobile operated by defendant Williams and purchased by

Williams from defendant Madden. From an order of the trial court sustaining a motion for an involuntary nonsuit as to defendant Madden, plaintiff brings this appeal.

A guardian ad litem was appointed for defendant Williams, a minor, but no appearance was made by him or on his behalf. He was present during the trial, but not represented by counsel. No judgment has been entered against or in favor of Williams, and he is not a party to this appeal.

For the purposes of this opinion we will refer to defendant Eddie Williams as "Williams", and to the defendant John R. Madden, dba Jolly John's, as the "defendant."

The complaint charged that defendant was guilty of negligence, proximately causing plaintiff's injuries, as follows:

"1. In selling, for operation upon the streets of the City of Portland, Oregon, a motor vehicle in a dangerously defective condition when he knew, or in the exercise of reasonable care should have known, that said vehicle was dangerously defective and a menace to public safety.

"2. In failing to equip said motor vehicle, prior to its sale to defendant Eddie Williams, with brakes adequate to control the movement of and to stop and hold said vehicle.

"3. In failing to equip said motor vehicle, prior to its sale to defendant Eddie Williams, with two separate means of applying the brakes, each of which means should have been effective to apply the brakes to at least two wheels.

"4. In failing to warn the defendant Eddie Williams of the dangerously defective condition of said motor vehicle.

"5. In selling said dangerously defective motor vehicle to defendant Eddie Williams when he knew, or in the exercise of reasonable care should have

known, that said defendant would put said vehicle to use without remedying its defects.

"6. In selling said dangerously defective motor vehicle to defendant Eddie Williams when he knew, or in the exercise of reasonable care should have known, that said defendant Eddie Williams was a minor whose operator's license had been revoked and who was an unfit person to be entrusted with the operation of said vehicle.

"7. In failing to equip said motor vehicle with a horn capable of giving audible warning."

The defendant moved for an involuntary nonsuit as follows:

"The defendant moves the court for a judgment of involuntary nonsuit upon the following grounds and reasons:

"First, that there is no competent or substantial evidence that the defendant was negligent, as alleged in the Complaint.

"Second, that there is no competent or substantial evidence that any negligence of the defendant, as alleged in the Complaint, was a cause or proximate cause of the accident and of plaintiff's injuries.

"Third, upon the ground and for the reason that the evidence affirmatively shows that the sole proximate cause of this accident was the intervening negligence of the defendant, Eddie Williams, which constituted a superseding cause, insulating any negligence of the defendant and rendering it remote."

The trial court granted this motion, and the granting of this motion is plaintiff's sole assignment of error. "* * * In considering the propriety of these rulings, the motions must be regarded as having admitted the truth of plaintiff's evidence, and of every inference of fact that may be drawn from the evidence. The evidence itself must be interpreted in the light

most favorable to plaintiff. *McCall v. Inter Harbor Nav. Co.*, 154 Or 252, 59 P2d 697. Where the evidence conflicts, the court may not infringe upon the function of the jury by seeking to weigh or evaluate it, but is concerned only with the question of whether or not there was substantial evidence to carry the case to the jury and to support the verdict." *Fish v. Southern Pacific Co.*, 173 Or 294, 301, 143 P2d 917, 145 P2d 991.

On March 7, 1952, Williams purchased a certain 1950 Ford convertible automobile from defendant under a conditional sales contract. Williams and defendant testified that before Williams purchased the car, the defendant assured him that the car had been sent to the shop and that "it had been mechanically gone over completely, and it was in good shape. Not only the motor, but the entire mechanism of the car was in good shape." Later, on the day of the purchase, Williams attempted to stop the car at a stop light, and the brakes, both foot and emergency, failed to function. Williams coasted the car into a service station and had the attendant, Chester L. Toombs, check the brakes. Toombs testified that he looked underneath the car, observed considerable wet and caked brake fluid on the left front tire, wheel and brake drum and added braked fluid to the system. After adding fluid, the brakes operated satisfactorily up until March 16. Williams testified as to the events of that day:

"A * * * I was stopping for a light, and I thought I would just check to be sure I could stop. I applied my brakes, and they were extremely low, almost to the point of not stopping at all. So I pulled into the service station. There is one on the corner. So I pulled in there and had more fluid put in.

"Q They went out on you a second time?

"A Yes.

"Q Did you go through any lights that time or stop signs?

"A No, I didn't.

"Q When they went out on you the second time, what did you plan? What did you decide to do?

"A Well, after the second time it occurred to me there was something wrong more than just the evaporation of the fluid. I mean, just couldn't be evaporating that fast. I decided to take it back to Madden the following Saturday when I had time to do it. I had a half day I could take off then."

The next brake failure occurred at the time of the accident on March 20, 1952. Williams described his activities prior to the accident as follows:

"A I left work at about 5:15. I got off at 5 o'clock. Took me about fifteen minutes to get out to my car. Drove off the parking lot and was coming down Burnside, and I stopped for the light at 19th. The car did stop. I pulled off the traffic light on 19th coming down Burnside. I got to 14th, and there was a line of cars stopped for the light on 12th. That is how long the line was. Traffic was heavy. I was going about fifteen miles an hour. I applied my brakes to stop, the car didn't stop. I tried both brakes, handbrake and foot brakes. Nothing happened. So I decided to hit a telephone pole in order not to hit any other cars in the traffic line. I veered to the right to stop, and as I approached the pole, I did not see Mr. Stout standing against the pole. I did go up on the sidewalk. I struck a car in the process of doing so, and then I hit Mr. Stout, due to the fact the brakes would not hold.

\* \* \* \* \*

"Q Did you blow your horn while you were making that movement with your car?
"A The horn didn't work.

"Q Had the horn ever worked?
"A No.

"Q Just didn't have a horn?
"A No.

"Q Did you try your handbrake, your emergency brake on that occasion?
"A Yes, I did.

"Q And what did you find?
"A No results.

"Q Now, Eddie, when you left the garage or when you left to go home after work that evening and started down that street, did you think your brakes were working so you could stop your car?
"A Yes, I did.

"Q They had worked on the way going over that morning, had they?
"A Yes.

"Q And what was your thought about whether they would last until you could get the car back to Mr. Madden? What was your thought about it?
"A Well, I thought they would last until I did get back out.

"Q Have you ever had any experience with brakes before?
"A No.

Liability of the manufacturer or vendor of a chattel for negligence to a remote vendee, or to anyone likely to use or come in contact with the chattel, has been the subject of increasing judicial attention. The decisions in this field were influenced by an asserted "general rule" that a manufacturer or supplier is never liable for negligence to a remote vendee or

other person with whom he has had no contractual relation. This asserted general rule had its origin in *Winterbottom v. Wright,* 10 M&W 109, decided in 1842. The complaint in that case was directed against the furnisher of a coach. It alleged that he had furnished an unsafe coach in violation of his contract, with the result that the coach broke down and hurt the plaintiff coachman. There was no allegation of negligence on the part of the defendant, and, since the plaintiff was not a party to the contract upon which he based his complaint, a demurrer rightfully was sustained. However, there was certain dictum in the opinion of Lord Abinger, C.B., to the effect that there could be no liability for negligence upon the defendant contractor for the basic reason that there was no privity of contract between the plaintiff and the defendant contractor. Lord Abinger set out the reason for his statement in 10 M&W, at p. 114:

"* * * There is no privity of contract between these parties; and if the plaintiff can sue, every passenger, or even any person passing along the road, who was injured by the upsetting of the coach, might bring a similar action. Unless we confine the operation of such contracts as this to the parties who entered into them, the most absurd and outrageous consequences, to which I see no limit, would ensue."

The dictum of Lord Abinger was applied in several American cases: *Davidson v Nichols,* 11 Allen (Mass) 514; *National Sav. Bank v. Ward,* 100 US 195, 25 L ed 621; and became fixed as a common law rule of the law of negligence in both American cases and textbooks. As soon as the general rule became recognized, however, exceptions began to develop. The exceptions, for the most part, have stemmed from the case of *Thomas v. Winchester,* 6 NY 397, 57 AmDec

455, decided in 1852, wherein a manufacturing druggist falsely labeled poison; a sale was made to a druggist who in turn sold to the plaintiff, a customer. The customer recovered damages from the manufacturing druggist who negligently affixed the label. The court cited *Winterbottom v. Wright,* supra, with approval, but held that the general rule did not apply to the sale of a poisonous drug in place of a harmless medicine, a substance which was imminently dangerous. In *Thomas v. Winchester,* supra, p. 409, the court stated:

"* * * The defendant's negligence put human life in imminent danger. Can it be said, that there was no duty on the part of the defendant to avoid the creation of that danger by the exercise of greater caution? or that the exercise of that caution was a duty only to his immediate vendee, whose life was not endangered? The defendant's duty arose out of the nature of his business and the danger to others incident to its mismanagement. Nothing but mischief like that which actually happened could have been expected from sending the poison falsely labeled into the market; and the defendant is justly responsible for the probable consequences of the act."

The exception was permitted to apply only in cases involving what has been described as "inherently dangerous" chattels, such as poisons, drugs, explosives, inflammable oils, and guns, articles or products which in and of themselves contained danger to human life and limb. However, the courts were not uniform in the application of the words "inherently dangerous." The phrases "intrinsically dangerous," "dangerous instrumentality," and "imminently dangerous" were adopted and applied with a variety of results. There was constant pressure to enlarge the concept of "inherently dangerous" chattels and to narrow the

things covered by the general rule of nonliability. This was accomplished largely by defining an "imminently dangerous" article as one which, although safe to be used for the purpose intended if properly constructed, by reason of its defective design or construction, may reasonably be apprehended to cause injury to anyone properly using the article for the purpose for which it was intended.

In *Devlin v. Smith,* 89 NY 470, 42 Am Rep 311, the exception was extended to a situation where a contractor built a scaffold for a painter. The painter's servants were injured and the contractor was held liable on the theory that, although a scaffold is not inherently dangerous, due to the negligent construction of that particular scaffold, it was imminently dangerous to human life, and the contractor breached a duty to make it safe which he owed to all who were likely to use it.

In *Schubert v. J. R. Clark Co.,* 49 Minn 331, 51 NW 1103, 15 LRA 818, it was held that where a painter purchased from a manufacturer a stepladder, and one of the painter's employees was injured by the breaking of a step caused by the negligence of the manufacturer, the latter was liable to the employee.

Judge Sanborn in *Huset v. J. I. Case Threshing Mach. Co.,* 120 F 865, stated that the Devlin and Schubert cases were the only decisions in conflict with the general rule set out in *Winterbottom v. Wright,* supra. At page 867 of the opinion Judge Sanborn stated:

> "Actions for negligence are for breaches of duty. Actions on contracts are for breaches of agreements. Hence the limits of liability for negligence are not the limits of liability for breaches of contracts, and actions for negligence often ac-

crue where actions upon contracts do not arise, and vice versa. It is a rational and fair deduction from the rules to which brief reference has been made that one who makes or sells a machine, a building, a tool, or an article of merchandise designed and fitted for a specific use is liable to the person who, in the natural course of events, uses it for the purpose for which it was made or sold, for an injury which is the natural and probable consequence of the negligence of the manufacturer or vendor in its construction or sale. But when a contractor builds a house or a bridge, or a manufacturer constructs a car or a carriage, for the owner thereof, under a special contract with him, an injury to any other person than the owner for whom the article is built and to whom it is delivered cannot ordinarily be foreseen or reasonably anticipated as the probable result of the negligence in its construction. So, when a manufacturer sells articles to the wholesale or retail dealers, or to those who are to use them, injury to third persons is not generally the natural or probable effect of negligence in their manufacture, because (1) such a result cannot ordinarily be reasonably anticipated, and because (2) an independent cause—the responsible human agency of the purchaser—without which the injury to the third person would not occur, intervenes, and, as Wharton says, "insulates" the negligence of the manufacturer from the injury to the third person. Wharton on Law of Negligence (2d Ed.) § 134. For the reason that in the cases of the character which have been mentioned the natural and probable effect of the negligence of the contractor or manufacturer will generally be limited to the party for whom the article is constructed, or to whom it is sold, and perhaps more than all this, for the reason that a wise and conservative public policy has impressed the courts with the view that there must be a fixed and definite limitation to the liability of manufacturers and vendors for negligence in the construction and sale of complicated machines and structures which

are to be operated or used by the intelligent and the ignorant, the skillful and the incompetent, the watchful and the careless, parties that cannot be known to the manufacturers or vendors, and who use the articles all over the country hundreds of miles distant from the place of their manufacture or original sale, a general rule has been adopted and has become established by repeated decisions of the courts of England and of this country that in these cases the liability of the contractor or manufacturer for negligence in construction or sale of the articles which he makes or vends is limited to the persons to whom he is liable under his contracts of construction or sale. The limits of the liability for negligence and for breaches of contract in cases of this character are held to be identical. The general rule is that a contractor, manufacturer, or vendor is not liable to third parties who have no contractual relations with him for negligence in the construction, manufacture, or sale of the articles he handles.''

Judge Sanborn also stated, p. 870, that there were three exceptions to the rule:

''But while this general rule is both established and settled, there are, as is usually the case, exceptions to it as well defined and settled as the rule itself. There are three exceptions to this rule.

''The first is that an act of negligence of a manufacturer or vendor which is imminently dangerous to the life or health of mankind, and which is committed in the preparation or sale of an article intended to preserve, destroy, or affect human life, is actionable by third parties who suffer from the negligence. * * *

''The second exception is that an owner's act of negligence which causes injury to one who is invited by him to use his defective appliance upon the owner's premises may form the basis of an action against the owner. * * *

"The third exception to the rule is that one who sells or delivers an article which he knows to be imminently dangerous to life or limb to another without notice of its qualities is liable to any person who suffers an injury therefrom which might have been reasonably anticipated, whether there were any contractual relations between the parties or not."

The problems created by the rule and its exceptions are stated in 164 ALR 584:

"Adapting the formalism or ritual of a nineteenth century rule, based on the simple conditions of the early part of that century, to the complexities of twentieth century life and inventions, has occasioned great difficulty for the courts. In their position as guardians of the welfare of the public, along with the various legislative bodies, the general rule has occasioned difficulty to the courts because of its obvious inapplicability to most of the complicated products now being manufactured for the consuming public. In an effort to make the jurisprudence of the present period conform to existing social and economical conditions, the courts have wrestled with the rule; they have constricted it by the creation and enlargement of numerous exceptions. These exceptions have reached a place in the law where they have almost, if not completely, swallowed up the so-called 'rule.'"

Mr. Justice Cardozo, in *MacPherson v. Buick Motor Co.*, 217 NY 382, 111 NE 1050, pointed the way toward a return to reliance on the fundamental principles of the common law of negligence, and to the abandonment of the general rule and its exceptions. In that case, a manufacturer sold an automobile equipped with a defective wheel to a dealer and was held liable for the injuries suffered by the plaintiff, who purchased the car from the dealer, when the wheel collapsed. In his opinion, p. 385, Justice Car-

dozo set forth the rule of liability in *Thomas v. Winchester,* supra, and stated:

"\* \* \* A poison falsely labeled, is likely to injure any one who gets it. Because the danger is to be foreseen, there is a duty to avoid the injury."

He then extended this principle so as to apply generally, p. 389:

"We hold, then, that the principle of Thomas v. Winchester is not limited to poisons, explosives, and things of like nature, to things which in their normal operation are implements of destruction. *If the nature of a thing is such that it is reasonably certain to place life and limb in peril when negligently made, it is then a thing of danger.* Its nature gives warning of the consequences to be expected. *If to the element of danger there is added knowledge that the thing will be used by persons other than the purchaser, and used without new tests, then, irrespective of contract, the manufacturer of this thing of danger is under a duty to make it carefully."* (Italics added)

The doctrine set forth in *MacPherson v. Buick Motor Co.,* supra, is now of general acceptance. 2 Restatement 1073-1089, Torts §§ 394-402; Prosser, Torts, 206-210, 673-688. But we need not at this time, for the purposes of this case, determine whether the general rule of nonliability to persons not in privity of contract still exists or is to be denied in this state; see *Carter v. Yardley & Co., Ltd.,* 319 Mass 92, 64 NE2d 693, 164 ALR 559; for the facts of this case place the plaintiff's rights clearly under the generally recognized and accepted exception to the general rule.

In *Bogart v. Cohen-Anderson Co.,* 164 Or 233, 236, 98 P2d 720, we said:

"It is common knowledge that an automobile with defective brakes is, in view of its power,

weight and speed, a dangerous instrumentality. Indeed, the legislature recognized such fact by requiring that 'every motor vehicle * * * when operated upon a highway shall be equipped with brakes adequate to control the movement of and to stop and hold such vehicle * * *' (§§ 55-2613, Oregon Code 1935 Supp.)—the standard of adequacy being in subdivision (e) of the above section. An automobile dealer is not an insurer against the defective condition of a car put into the hands of a prospective purchaser, but he must use ordinary care to see that it is in a reasonably safe condition to use on the public highways. The failure to comply with this legal duty or obligation makes the bailor liable to third persons if the injury is the proximate result of such negligence. Saunders System Birmingham Co. v. Adams, 217 Ala. 621, 117 So. 72, 61 A.L.R. 1333; Collette v. Page, 44 R.I. 26, 114 Atl. 136, 18 A.L.R. 74; Eklof v. Waterston, 132 Or 479, 285 P. 201, 68 A.L.R. 1002; 8 C.J.S. 318; Vaughn v. Millington Motor Co., 160 Tenn. 197, 22 S.W. (2d) 226.''

While in *Bogart v. Cohen-Anderson Co.,* supra, the relationship was that of bailor and bailee, the principle involved applies with equal force where the relationship is that of seller and purchaser.

■ There is ample evidence in the record to show that defendant should have known, in the exercise of reasonable care, that the brakes were defective. Mr. Toombs, the service station attendant who added brake fluid to the car on the day it was purchased, testified that there was considerable caked and fresh brake fluid on the wheel and brake drum that could have been discovered easily by an external observation. Mr. Bissio, the mechanic who repaired the brakes after the accident, testified that the piston, rubbers, and cylinder walls were worn and scored, and there was sufficient testimony for the jury to

find that this condition existed to a great extent at the time of the sale. We feel that any reasonable man must have foreseen that the operation of this car on the crowded streets of Portland would bring it into contact with third parties, both motorists and pedestrians, who were using the streets and sidewalks. Thus a duty arose upon the part of the defendant to exercise reasonable care to prevent injury to that class of third parties of which plaintiff was a member.

It is well-established in this state that for a cause of action for negligence to exist there must be (1) a legal duty to use care, (2) a breach thereof, and (3) damage to the plaintiff which (4) was proximately caused by the breach. *Schumann v. Bank of California, N.A.,* 114 Or 336, 233 P 860, 37 ALR 1531; *Chambers v. Everding & Farrell,* 71 Or 521, 136 P 885, 143 P 616. Plaintiff produced sufficient evidence to establish a legal duty, and the fact that plaintiff suffered substantial injuries is not questioned. It is also clear that defendant breached his legal duty, but some difficulty arises in determining the nature of his breach. Defendant contends that the only duty imposed upon a used car dealer is to warn the purchaser of defects known to him or discoverable by a reasonable inspection, and that the only breach here involved is his failure to warn.

Plaintiff states his theory in his brief in the following language:

"* * * Apparently, counsel [for defendant] takes this position [defendant's theory paraphrased above] because of his realization that if the only duty of a used car dealer is to give warning of defective brakes, negligence for breach of such a duty might more easily be held to be

superseded where the purchaser later acquires knowledge of such defects. On the other hand, if the used car dealer has an affirmative duty to repair the defective brakes it would be far more difficult to logically hold that negligence for breach of such a duty would be completely superseded where the purchaser later acquires knowledge of the defect. This is for the reason that if that duty had been performed and the brakes had been repaired the accident would not have happened. Therefore, the negligence in failing to make such repairs would continue at least as a concurrent cause but for which the accident would not have happened and thus logically could not be completely superseded even by the later knowledge of the purchaser that the brakes were defective.''

In 5 Am Jur 690, Automobiles § 349, it is stated that there is a conflict of authority on this point:

''* * * The duty of the seller of a second-hand automobile to exercise care with respect to its equipment so that it may be kept under control and not become a menace to life and limb is the same as that of the manufacturer of a new automobile, especially where the car is represented to be equipped with standard equipment. If the automobile is capable of being made safe, it is, according to this theory, the seller's duty to make it safe.

''According to another view, it is the seller's duty to communicate information as to the defect to the purchaser. Failure to do so may impose liability. Upon giving this information, his duty is discharged unless, from facts known or which he should know, there is a probability that the buyer will use the automobile without remedying the defects. Turning a dangerously defective automobile over to a buyer under such circumstances is equivalent to turning it over to a driver known to be unfit to use it.''

We do not believe there is an absolute duty to repair. A duty to third parties arises only when

danger to them reasonably may be foreseen. Where the dealer warns the purchaser of the defect, it, normally, would be unreasonable to foresee danger to third parties, for the dealer can rely on the purchaser to make the necessary repairs before operating it in public contrary to the laws of the state. However, where the purchaser is incompetent, notoriously reckless, or financially incapable of making the repairs, and the dealer is aware or as a reasonable man should be aware of these facts, then a warning is not sufficent. In other words, it is still foreseeable that third parties may be exposed to the danger and the dealer owes a duty which, under these circumstances, would be to repair the car, before selling it.

The duty is described in 42 ALR 1250, as follows:

"* * * Where, in the exercise of ordinary sense, the seller of an article must know that if it is defective it will be imminently dangerous to persons who he knows will come in contact therewith, a duty rests upon such seller to use ordinary care to ascertain the condition of the article *and see that it is safe,* especially where, by representations or warranties that the article is safe, he induces the sale; and if he fails to exercise ordinary care to ascertain the safety of the article, and as a result he actually sells it in an imminently dangerous condition he is liable for personal injuries proximately resulting therefrom, at least, to that class of persons who he knows must come in contact with the article; * * *" (Italics added)

This rule was adopted in *Flies v. Fox Bros. Buick Co.,* 196 Wis 196, 218 NW 855, 60 ALR 357, in which a dealer was held liable for injuries to a third person as a proximate result of defendant's negligence in selling a used car. The court held, p. 209:

"* * * The situation of the Fox Brothers falls squarely within the rule by the author of the

note in 42 A.L.R. at p. 1250, heretofore quoted. If that rule be sound law, and we believe it is, it is not necessary to say more. We think, however, that it may properly be said that the duty of the seller of a second-hand automobile with reference to exercising care with respect to its equipment so that it may be kept under control and not become a menace to life and limb, is exactly like that of the manufacturer of a new automobile; and this is especially true where the sale is accompanied with a representation, as the jury found to have been made in this case, that the automobile was equipped with standard equipment. * * * The law would show scant consideration for human life if it did not lay this degree of care upon the sellers of this car for the benefit of all who were likely to come in contact therewith.''

In *Egan Chevrolet Co. v. Bruner,* 102 F2d 373, 375, 122 ALR 987, the court held:

"A retail dealer who takes a used truck in trade and undertakes to repair and recondition it for resale for use upon the public highways owes a duty to the public to use reasonable care in the making of tests for the purpose of detecting defects which would make the truck a menace to those who might use it or come in contact with it *and in making the repairs necessary to render the truck reasonably safe for use upon the public highways,* and is charged with knowledge of defects which are patent or discoverable in the exercise of ordinary care. This rule, we think, is readily deducible from Flies v. Fox Bros. Buick Co., supra; Hudson v. Moonier, supra, 94 F2d 132; Ferraro v. Taylor, supra; MacPherson v. Buick Motor Co., supra; Sec. 404, p. 1092, Restatement of the Law of Torts. Compare Bergstresser v. Van Hoy, 142 Kan 88, 45 P2d 855, 99 ALR 236.'' (Italics added)

The rule in the Egan case has been quoted and adopted in *Jones et al. v. Raney Chevrolet Co.,* 217

NC 693, 9 SE2d 395, and in *McLeod v. Holt Motor Co.*, 208 Minn 473, 294 NW 479.

In *O'Donnell v. Asplundh Tree Expert Co.*, 13 NJ 319, 335, 99 A2d 577, 586, a manufacturer of hooks used on tree climber's safety belts was held liable for injuries to the plaintiff incurred when a defective hook broke and the plaintiff fell. The court held:

> "There is no doubt in the case at bar but that the hook in question when put to the use intended by the defendant would become dangerous to human life and that therefore the defendant, as the supplier and vendor, was under the duty of reasonable care *to make it safe for the intended use.*" (Italics added)

In *Bock v. Truck and Tractor, Inc.*, 18 Wash2d 458, 475, 139 P2d 706, 713, the court held:

> "* * * a dealer in secondhand motor vehicles who undertakes to overhaul and recondition such vehicles for subsequent sale to the general public has the same duty as has the manufacturer * * *."

Defendant points out that, in all the aforementioned cases, there was no evidence that the interviewing purchaser acquired knowledge of the defect, and contends, therefore, that the statements in these cases, that a dealer owes a duty to repair, are dicta for the holdings can be sustained on the theory that the dealer failed to warn. While defendant's observation is correct, we do not agree with his resultant contention. As stated before, it is true in the normal case, that there is no duty to repair where the dealer warns the purchaser of the defects. In that case it is not foreseeable that third parties will be exposed to any danger. But where the dealer represents the car to be in good condition, or where the dealer warns

a purchaser who probably will not repair the defect before operating the car on the public streets, it becomes foreseeable that third parties may be injured. Failure to warn gives rise to the duty to third persons. To fulfill this duty, dealers, in the exercise of reasonable care, must repair the defects and make the automobile safe.

■■ Although there was sufficient substantial evidence from which the jury could have found that defendant was negligent in failing to repair the defective brakes, there must be evidence that defendant's negligence was the proximate cause of plaintiff's injuries before defendant can be held liable. Defendant contends that the accident was due to the negligence of Williams in failing to repair the brakes after learning of the defect; that any negligence on defendant's part was insulated by the negligence of Williams, and the proximate cause of plaintiff's injuries was no fault of defendant's.

Plaintiff contends that defendant's negligence was established as the proximate cause of the accident since, but for that negligence, the accident would not have happened. Plaintiff cites *State of Oregon v. Berry and Walker,* 204 Or 69, 80, 267 P2d 993, 267 P2d 995, 282 P2d 344, 282 P2d 347, which quotes from Shearman and Redfield on Negligence, Rev Ed, § 39, as follows:

> " 'There may be more than one proximate cause of an accident, if each of the causes asserted can be seen to have been an efficient one, without which the injury resulting would not have been sustained.' "

Plaintiff neglects that part of the rule which requires a legal cause to be an efficient one. In *Wheeler v.*

*Nickels,* 168 Or 604, 612, 126 P2d 32, we approved a quotation from 1 Beven, Negligence in Law, 3 ed, 155:

" ' * * * The *causa sine qua non* of an accident is not that on which depends the legal imputability of the accident. The liability depends not on that, but on the *causa efficiens.* In fact the same test is applicable to the ascertaining what negligence contributes to an injury, as we have already applied to the ascertaining negligence itself. We must trace the negligent consequences to the last responsible agent, who, either seeing the negligent consequences or negligently refusing to see them, has put into motion the force by which the injury was produced. To constitute a responsible agent there must be an accountable human will.' "

The general rule for determining proximate cause is set out in 38 Am Jur 729, Negligence § 72:

" * * * it can be stated as a general rule that ordinarily the intervention of a negligent act as the independent and efficient cause of an injury operates to relieve one who has been guilty of prior negligence from responsibility for the injury, * * *"

Elsewhere, this authority notes the conditions upon this general rule, (1) that the intervening actor shall be a conscious agency and (2) that his conduct could not have been reasonably anticipated. Discussing this phase of the question, this text reads at p. 731:

" * * * One who acts negligently is not bound necessarily to anticipate that another person will be negligent after the latter has discovered the danger arising from the former's negligence. The first actor, however, is not permitted to assume that the second actor will discover the danger caused by the first actor's negligence. Accordingly, where the second actor, after becoming aware of the existence of a potential danger created by the negligence of the first actor, acts neg-

ligently in respect of the dangerous situation and thereby brings about an accident with injurious consequences to others, the first actor is relieved of liability, because the condition created by him was merely a circumstance and not the proximate cause of the accident.''

This rule was adopted and applied in a case similar to the one at bar in *Ford Motor Co. v. Wagoner,* 183 Tenn 392 401, 192 SW2d 840, 844, 164 ALR 364, wherein the court held:

"We thus find the pertinent rule to be one of continuing liability of the manufacturer to successive purchasers, subject to be destroyed, however, by the intervening act of an agency which is (1) independent, (2) efficient, (3) conscious and (4) not reasonably to have been anticipated."

It hardly can be denied that Williams was negligent. He operated an automobile on the public streets without efficient brakes and thus became guilty of negligence per se by violating § 115-376a, OCLA, now ORS 483.444. No duty evolved upon Williams at the time of the sale to inspect the brakes.

In *Flies v. Fox Bros. Buick Co.,* supra, p. 201, it was held:

"In this case the jury found that at the time of the sale Fox Brothers [defendant used car dealer] represented to Johnson [prospective purchaser] that the car was equipped with all standard equipments and in proper operating condition for use upon the streets of La Crosse. This representation must have been made by Fox Brothers with the intention of having Johnson rely upon it, in which event they must have anticipated that he would make no inspection concerning the efficiency of the brakes. Their own representations having induced or contributed to Johnson's failure to make the inspection, they cannot claim im-

munity from the consequences of their own negligence because of Johnson's failure to make an inspection relying upon their representations. Even though Johnson's failure to inspect constituted negligence available to the plaintiff, it did not constitute an intervening cause as to Fox Brothers.''

In the case at bar, defendant represented to Williams that the car had been reconditioned and was in good operating condition. He reasonably should have foreseen that Williams would operate the car in the condition in which he received it without conducting an inspection.

Plaintiff contends that even though Williams' negligence, after knowledge of the defective condition of the car, constituted an independent, efficient and conscious act, defendant remains liable on the grounds that he reasonably should have foreseen that Williams would continue to drive after discovering the defective brakes. His basis for this contention is that (1) the car was a ''hot rod''; it had dual exhausts, was ''blacked out'' (the chrome had been removed), and was equipped with a 1948 Mercury motor; (2) anyone interested in this car would be a ''hot rod'' driver, and it is common knowledge that ''hot rod'' drivers are, as a class, notoriously given to taking chances with the safety of themselves and others; (3) Williams wore a mustache; (4) Williams was financially incapable of repairing the brakes; (5) Williams was only 19 years old; (6) Williams' driver's license had been suspended due to his failure to furnish proof of financial responsibility in connection with one of three previous accidents.

We do not believe the evidence is sufficient to charge the defendant with negligence in selling to Williams. Defendant was not aware of all the facts

mentioned above at the time of the sale. We find no evidence to support an inference that Williams was a "hot rod" driver. He used the car to go to and from work. He testified that he was interested in the car because it had a new motor "which would last longer than the original motor would." Although Williams was only 19 years old, he was a married man, the father of one child, and was a high school graduate. He held two jobs and was earning $235 per month. The cost of the brake repairs would have been only $10 or $11. He had owned three automobiles prior to the purchase of this one. There was no evidence offered that he was at fault in any of his three prior accidents, or that defendant knew of the facts surrounding these accidents. It would have been error to have submitted this issue to the jury.

The car involved in the case at bar had no emergency brake or horn, and the foot brakes were defective. The absence of the horn could not have been the proximate cause of the accident for the evidence is uncontroverted that Williams did not see plaintiff before the accident and made no effort to sound the horn in warning. Williams was aware of the fact that the emergency brake was useless before the accident occurred. Although it may have been reasonably foreseeable that Williams would drive the car without an emergency brake so long as he was not conscious of the defective foot brakes, we do not believe, as held above, that it was foreseeable that he would drive the car when he was conscious of the fact that the emergency brake was useless and that the foot brakes were so defective as to fail at any time.

The question that must be answered in determin-

ing whether Williams' negligence superseded that of respondent is whether Williams was conscious of the dangerous defect in the foot brake system and of the risk involved.

This issue was considered in *Ford Motor Co. et al. v. Wagoner,* supra, and was the basis for the decision that the defendant manufacturer was not liable. In that case defendant Ford Motor Company sold an automobile to the Volunteer Motor Co., one of defendant's sales agencies. Volunteer Motor Co. sold the car to Norman, one of its salesmen, who used it as a demonstrator. After driving the car some 10,000 miles, Norman severed his connections with Volunteer Motors and sold the car to one Baxendale. Shortly after this model was put upon the market, the attention of defendant was called to the fact that the hood catch, with which these cars were equipped, was defective and would come loose upon subjection to a sever jolt, and immediately defendant supplied its agencies with auxiliary catches to be installed on all cars of this model. It was after Norman had severed connections with Volunteer Motors and before he sold the car to Baxendale that Norman was offered one of the auxiliary catches. He declined the offer. Plaintiff, a guest of Baxendale, was injured when the hood catch gave way and the hood flew up blinding the driver, and an accident resulted. The jury found for the defendant, but the court of appeals reversed. The Tennessee Supreme Court, in affirming the trial court's judgment for defendant, stated at page 392:

"We thus find the pertinent rule to be one of continuing liability of the manufacturer to successive purchasers, subject to be destroyed, however, by the intervening act of an agency which is (1) independent, (2) efficient, (3) conscious and (4) not reasonably to have been anticipated."

In the case before us, defendant represented to Williams that the car had been reconditioned and that the "working parts" were in good operating condition. The brakes failed on the day of the purchase and Williams had brake fluid installed. The brakes then functioned, and Williams testified that he thought the failure was due merely to the evaporation of the fluid. Nine days later, while Williams was operating the car, the brakes failed a second time. Williams testified:

"I was stopping for a light, and I thought I would just check to be sure I could stop. I applied my brakes, and they were extremely low, almost to the point of not stopping at all. So I pulled into the service station. There is one at the corner. So I pulled in there and had more fluid put in."

Williams testified that, at that time, he knew there was something wrong more than just the evaporation of the fluid, but that he thought the brakes would last for six more days when he could take the car back to defendant. After the second failing, the brakes worked up to the time of the accident, which occurred four days later.

We do not believe that the fact that Williams continued to use the automobile after he discovered the brakes were defective, because he thought they would last six days, can be considered as a reasonable anticipation from the sale of the automobile to be guarded against by the seller. Williams knew the brakes were defective and subject to failure; to say that he could gamble as to the time and place of failure and the defendant then would be liable would, in effect, make the defendant an insurer of the conduct of Williams.

The judgment of the trial court is affirmed.