**E. W. PETERSON and Ruth Ann Peterson, Plaintiffs,**

v.

**EUGENE WATER & ELECTRIC BOARD, Acting on Behalf of the City of Eugene, a municipal corporation, Defendant.**

Insurance Company of North America, a Pennsylvania corporation, and Fireman's Fund Insurance Company, a California corporation, Additional Plaintiffs on Counterclaim,

Bechtel Corporation, a Delaware corporation, Additional Defendant on Counterclaim.

Civ. No. 65–395.

United States District Court
D. Oregon.
April 18, 1967.

---

Thomas Tongue and Wm. M. Dale, Jr., Hicks, Tongue, Dale & Strader, Portland, Or., for plaintiffs.

Robert J. Miller, Black, Kendall, Tremaine, Booth & Higgins, Portland, Or., for Eugene Water & Electric Bd.

John Gordon Gearin, McColloch, Dezendorf & Spears, Portland, Or., for Bechtel Corp.

## OPINION FINDINGS AND ORDER

KILKENNY, District Judge:

Segregated for trial is the limited issue on the effect of a receipt and release, executed by Bechtel Corporation (Bechtel) and Eugene Water & Electric Board (Eugene) on October 14, 1963.

Eugene, defendant and third-party plaintiff, owns and operates a series of hydro-electric dams and reservoirs, collectively known as the Carmen-Smith Project, on the Smith and McKenzie Rivers in Lane and Linn Counties in Oregon.

Bechtel designed and supervised the construction of certain aspects of the project under a contract with Eugene dated August 27, 1959. Plaintiff, E. W. Peterson, was Bechtel's resident project engineer and the owner of real property adjacent to the McKenzie River below the Carmen-Smith Project.

Peterson, in his complaint, charges that about December 22, 1964, Eugene stored an immense amount of water in its reservoirs and about said date, without warning, released an abnormal amount of the water through the spillways of the dams, thus increasing the natural flow of the McKenzie River and resulting in substantial damage to his property. Eugene denies this and alleges that the damage, if any, sustained by plaintiffs was an Act of God. Also, Eugene filed a counterclaim against Peterson and the Bechtel Corporation.

At the time plaintiffs' property was damaged, Carmen Power House, a structure located inside the Trail Bridge Reservoir, was inundated by a rise in the water level. Eugene charges in the counterclaim that Peterson and Bechtel were responsible for the damage resulting from such rise because of negligence in design, location and construction of the power house and in failing to give proper warning and advice. Fireman's Fund Insurance Company and Insurance Company of North America, the concerns which had insured the power house, were added as parties plaintiff to the counterclaim on motion of plaintiffs.

In addition to the work on the Carmen Power House, Bechtel also designed, prepared cost estimates and supervised the construction of the Smith Power Tunnel, another major part of the Carmen-Smith Project. The Smith Power Tunnel failed

288

during tests in the early part of 1963 and thereafter a controversy arose between Eugene and Bechtel as to the latter's responsibility for the cost of redesigning and repairing the Smith Power Tunnel. This subject was compromised and settled by the parties, at which time the receipt and release,[1] here in question, was executed.

Simply stated, the issue before me is whether the instrument executed October 14, 1963, released and discharged Bechtel and Peterson from liability for the damage sustained December 22, 1964, on (1) a theory of negligence in design and supervision, or (2) liability for failure to give reasonable and proper warnings.

■ Generally, the breadth and scope of a release is determined by the intention of the parties at the time of execution. Consequently, its operation is limited to matters within the contemplation of the parties at that time. Hicklin v. Anders, 201 Or. 128, 253 P.2d 897, 269 P.2d 521 (1954); Rudick v. Pioneer Memorial Hospital, 296 F.2d 316 (9th Cir. 1961); United States v. Ramstad Construction Co., 194 F.Supp. 379 (D. Alaska 1961); Williston on Contracts (Rev. ed.), Vol. 6, § 1825, pp. 5167–69.

Undisputed is the fact that Bechtel, in the exercise of its expertise on the subject, designed and supervised the construction of the project. Moreover, the record is practically undisputed that it advised Eugene as to difficulties encountered and the progress on the project. When, in March, 1963, the project was nearing substantial completion Eugene incurred additional cost in excess of one million dollars in redesigning and reconstructing the Smith Power Tunnel, it very properly made a claim against Bechtel for the additional cost.

As an outgrowth of this claim, a meeting was held in Bechtel's San Francisco offices, at which time the representatives of the respective parties thoroughly discussed the nature of the tunnel failure and the problems resulting therefrom, particularly the unfavorable financial position in which the failure placed Eugene. Even the project's general contractor, Peter Kiewit Sons Co., was drawn into the discussion by reason of a demand for additional compensation. The meeting adjourned after a discussion of the reasons for the tunnel failure and the legal responsibility of professional engineers for project failures. The subject of a release was not mentioned at this meeting. Later, on October 7th, the executive vice-president of Bechtel contacted the superintendent-secretary of Eugene and proposed that Bechtel make a payment or reduce its fee in connection with the tunnel controversy and suggested an additional conference. This conference was held on October 11th, at which time the parties again discussed the problem at the San Francisco offices of Bechtel. This discussion centered around the sum of money Bechtel should pay and in what form it should be paid. A release was not discussed. Bechtel, in that meeting, agreed to reduce its fee to the Board by the sum of $350,000.00.

I. "RECEIPT AND RELEASE"

"IN CONSIDERATION of a credit by Bechtel Corporation to Eugene Water and Electric Board of the sum of Three Hundred Fifty Thousand Dollars ($350,-000.00), representing a reduction of the compensation to which Bechtel Corporation is entitled under the terms of that certain Contract dated August 27, 1959, between Eugene Water and Electric Board and Bechtel Corporation for services in connection with the construction of the 'Carmen-Smith Project'; and

"IN FURTHER CONSIDERATION of the agreement by Bechtel Corporation to reduce the compensation to which it is entitled with respect to all invoices submitted subsequent to September 30, 1963, to the actual direct costs incurred, without allowance for indirect costs or fee;

"IT IS HEREBY AGREED that all claims of either party hereto against the other, pertaining to the Carmen-Smith Project or arising out of the performance of the referred to Contract, are hereby resolved, satisfied and discharged.

"This Receipt and Release is for the purpose of compromising any and all claims either of the parties hereto has against the other and to avoid litigation, and no liability by either party is hereby admitted but is expressly denied.

"Dated this 14th day of October, 1963."
(Omitting Signatures.)

A rough draft of a release[2] was presented. This instrument, together with the final draft, was prepared by counsel for Bechtel. After preparation and execution by Bechtel, the instrument was forwarded to Eugene where it was signed on October 14th.

Manifestly, the only problems in the minds of the parties during the negotiations and at the time the release was executed were those connected with, or occasioned by, the rupture of the tunnel project and the demands being made by the project's main contractor, Peter Kiewit Sons Co.

The language of the instrument and the actions of the parties support, beyond question, a finding that the parties never intended to discharge Bechtel from responsibility for future damages. The language of the release, when interpreted in the light of the negotiations between the parties is conclusive against Bechtel's contention. The significance of the use of the terms "all" and "arising out of", although they may create a certain amount of ambiguity, completely disappear when viewed in the light of the negotiations. Moreover, it must be kept in mind that Bechtel, in drafting the release, consciously made it sufficiently broad to include the substantial demands of the contractor, which had not yet ripened into legal action.

Bechtel's argument that the claim for damages resulting from improper design of the power house, or failure to warn regarding its operation, was not a "future" claim, but existed at the very time the instrument was executed, is tenuous in the extreme. The fact that Eugene knew, or by the exercise of reasonable diligence should have known, before signing the release, of the maximum operating level of the Trail Bridge Reservoir and the elevation of the door and the windows of the Carmen Power House, does not require a different conclusion.

Eugene was still relying on the expertise of Bechtel.

Furthermore, a claim or a cause of action in negligence does not accrue until some damage occurs. Kropitzer v. City of Portland, 237 Or. 157, 390 P.2d 356 (1964); Berry v. Branner, Or., 421 P.2d 996 (1966); Stout v. Madden, 208 Or. 294, 300 P.2d 461 (1956). In this case there was no damage until the water invaded the power house on December 22, 1964, some fourteen months after the execution of the release. Vaughn v. Langmack, 236 Or. 542, 390 P.2d 142 (1964), on which plaintiffs principally rely was overruled by the Oregon Supreme Court in Berry v. Branner, supra. Bechtel attempts to avoid the effect of the *Berry* case by arguing that Eugene could reasonably have discovered and anticipated the alleged defects in design prior to the execution of the release. If the record would support a finding that Eugene was suspicious of the ability of Bechtel and should have hired an engineer to check on Bechtel's plans and specifications, this argument might be reasonable. However, the record before me can only support the view that Eugene had complete confidence in Bechtel and in its engineering experience. Under normal circumstances, an ordinary, prudent human being does not challenge the opinions and the designs of the experts he selects. If faced with the same set of facts, I am convinced and hold that the Oregon Supreme Court would arrive at the conclusion that Eugene was not bound to anticipate, nor discover, the defects prior to the date of signing the release. Of particular importance is the fact that the plans and specifications drafted by Bechtel and furnished to Eugene, prior to the execution of the release, did not, in any way, indicate that the power house was at the mercy of an abnormal rise in the water level of the reservoir. For that matter, the windows and doors through

---

2. (In Part.)
"In consideration of these reductions in fees it is mutually agreed between the parties that all financial obligations between the parties on this project have been satisfied and discharged except as to assistance EWEB may require from Bechtel in settling possible contractor claims and these to be at direct cost. * * * *"

which the power house was invaded by the water, were not even indicated. Even if indicated, a reasonable, prudent person would probably feel that the design of the windows and doors were such that they would withstand the pressure of any abnormal rise in the water. Again, I must mention that Bechtel, the expert, who was paid some two million dollars for advice, was the one who probably should have anticipated any such rise. Why, under the circumstances, should Eugene anticipate such a failure?

Bechtel's additional argument that the release should be construed to encompass future claims, for the reason that the parties so interpreted it when they decided to hold Bechtel harmless in the action instituted by the contractor against Eugene, is without merit. The obvious weakness in this argument, is that the contractor suits were not in any way "future" claims. The fact that legal action was not commenced thereon until after the release was executed is of no importance.

It is my finding and conclusion that the release under scrutiny does not bar Eugene from instituting an action against Bechtel for the power house damage sustained on December 22, 1964. As a consequence, cases cited by Bechtel to the effect that the release of one joint tort feasor releases the other, do not apply. Since Bechtel was not discharged by the release, the cases cited by Peterson to the effect that a release of one tort feasor releases all, are of no application. In other words, Peterson was not discharged from liability by the release.

These findings and conclusions shall not be construed as holding that Bechtel or Peterson are liable for the damage to the power house. In arriving at my findings and conclusions on the segregated issue, I believe it unnecessary to give my views with reference to Eugene's contention that the release did not discharge Bechtel from its duty, if there was one, to warn and give advice with regard to the project.

This opinion shall serve as my findings and conclusions. The release in question does not bar claims which arose after its execution. The counterclaim arose after the execution of the release. Consequently, the release is not a bar.

It is so ordered.