Argued May 4, affirmed May 20, 1970

GROVER, *Appellant, v.* STURGEON ET UX,
*Respondents.*

469 P2d 617

*Claud A. Ingram*, John Day, argued the cause and filed a brief for appellant.

*Wendell Gronso*, Burns, argued the cause for respondents. With him on the brief were Cramer & Gronso, Burns.

Before McAllister, Presiding Justice, and Sloan, O'Connell, Denecke, Holman, Tongue and Howell, Justices.

TONGUE, J.

This is an action on two promissory notes totalling $4,000, in which defendants counterclaimed for damages for breach of two oral agreements. The first was

an alleged agreement by plaintiff to pay $12,000 to defendant Loren Sturgeon as a bonus. The second was an alleged agreement by plaintiff to transfer to defendant Loren Sturgeon 25% of the stock in a corporation owned by plaintiff and allegedly worth $10,000. Plaintiff appeals from a verdict and judgment against him and in favor of defendants for $6,000.

Plaintiff has assigned four errors: (1) and (2) the failure to grant plaintiff's motions for directed verdicts on his first and second causes of action (for payment of the two promissory notes); (3) the refusal of a requested instruction that plaintiff was not responsible for a debt owed by a corporation (to pay the $12,000 bonus) unless the promise was in writing and signed by plaintiff; and (4) the refusal to grant plaintiff's motion for a directed verdict on defendant's counterclaim for failure to transfer 25% of the stock in another corporation on the ground that there was no evidence of the measure of damages (i.e., the value of such stock).

In considering these assignments of error some discussion of the facts becomes necessary, based upon the evidence offered by and most favorable to defendants, as this court must do on appeal from the verdict and judgment in favor of defendants.

Plaintiff was engaged in operating an automobile agency in Burns. The business was incorporated and plaintiff was its president and the owner of all of its stock. In March, 1966, plaintiff engaged defendant Loren Sturgeon as general manager of the business.

At Christmas time in 1966 plaintiff told Mr. Sturgeon that he had a "good bonus" coming for the good job he had done "in pulling the business out of the hole", but no amount was agreed upon. In October,

1967, plaintiff went to California. Upon leaving for California plaintiff promised to pay a bonus to Mr. Sturgeon if he would stay on as manager of the automobile business until it could be sold. Again, no amount was agreed upon. In April, 1968, plaintiff told Mr. Sturgeon that the amount of the bonuses to be paid to him would be $12,000 and that plaintiff would pay it personally, according to the testimony of defendant Sturgeon. A written agreement was also offered in evidence, under which plaintiff agreed that he would "cause to be recorded on the books" of his automobile business an entry showing a liability to Mr. Sturgeon in the sum of $12,000 for "unpaid bonuses."

Also, in October, 1967, plaintiff told Mr. Sturgeon that if he would stay on as manager until the automobile business was sold, and then move to California to join plaintiff in his new venture there he would give Sturgeon "25% of Pan-Pacific Homes", a trailer manufacturing business, purchased by plaintiff for $40,000. Thus, plaintiff promised to transfer to Mr. Sturgeon a "25% interest" in that business. Again, at "Christmas time" in 1967 plaintiff said that "the first of the year" he was going to transfer 25% of the stock to Mr. Sturgeon "as soon as the stock was available for transfer."

Meanwhile, in March, 1967, defendants borrowed $2,500 from a bank and plaintiff signed an agreement with the bank to guarantee payment of that loan. On July 9, 1968, that loan was renewed by a 90 day note signed by defendants and also by plaintiff as guarantor. No payments were made on that note by defendants. Mr. Sturgeon testified that in October, 1968, plaintiff said that he would pay the note and take $100 out of Sturgeon's pay check, which plaintiff then did.

On November 4, 1968, the bank was paid $100 in principal and interest, presumably by plaintiff.

In addition, on September 28, 1967, plaintiff loaned $1,500 to defendants on a promissory note payable in monthly installments over a period of two years. No payments were made by defendants on that note and no demands for payments were made by plaintiff, saying that defendants could pay it "as soon as this thing gets all settled," according to defendants.

Finally, in late 1968, plaintiff sold the automobile business in Burns, but refused to either pay Mr. Sturgeon the $12,000 bonus or transfer to him 25% of the stock in his new California business, although Mr. Sturgeon had stayed until then as manager and testified that he had also been ready to go to California with the plaintiff.

On November 20, 1968, the balance of the $2,500 note was paid by plaintiff by giving the bank another note, which was not paid until the sale of plaintiff's automobile business on February 18, 1969, when it was paid out of the proceeds of the sale of that business. Meanwhile, the $2,500 note, along with the $1,500 note, had been turned over by plaintiff to his attorney and on December 6, 1968, plaintiff filed this action to enforce payment of the notes and levied an attachment upon defendant's personal property, including his automobile and his wife's jewelry, among other things. Mr. Sturgeon also filed an action against Ganger & Grover Motor Co. to collect the bonus of $12,000, but apparently was unable to enforce payment against that corporation.

Plaintiff denied much of the foregoing testimony and contended that the California business (for which he paid $40,000) had no value, but did not produce any

records to establish that fact. He also admitted that he had transferred $54,000 to that business from his automobile business in Burns (apparently including the $40,000 purchase payment), none of which was repaid, and that he had also personally withdrawn other money from that corporation, leaving it without funds to pay the $12,000 bonus to Mr. Sturgeon.

■ On this record it may have been error to deny plaintiff's motions for directed verdicts on his two causes of action on the promissory notes. It is clear, however, that any such error was not prejudicial to plaintiff, since the trial court was careful to instruct the jury that if it found "that the plaintiff is entitled to recover on his complaint and that defendants are entitled to no recovery on their counterclaims, or if you find that the recovery is less than the amount you find for the plaintiff" it was to return a verdict for plaintiff in that amount, but that "if you find that he (plaintiff) is entitled to something, but is in a lesser amount than defendants are entitled to on their counterclaims", then the jury was to return a verdict for defendant for an amount representing the difference. Cf. *Western Feed Co. v. Heidloff*, 230 Or 324, 329-31, 370 P2d 612 (1962).

In this case defendant alleged two counterclaims: one based upon an agreement to pay defendant a bonus of $12,000 and the other based upon an agreement to transfer to defendant a 25% interest in a California business (purchased by plaintiff for $40,000) which plaintiff admitted to be worth $10,000, as discussed below. The principal consideration for both agreements was defendant's promise to remain as manager of the automobile business in Oregon until it was sold. Thus, it is obvious that defendant was not entitled to collect on both agreements.

Since the original amount of the two promissory notes totaled $4,000 and since it was agreed that the amount of the bonus payable to defendant (if payable by plaintiff) was the sum of $12,000, it is also obvious from the amount of the verdict, in the sum of $6,000, that the jury could not have based such a verdict upon an allowance of that counterclaim. On the other hand, since plaintiff himself admitted that at the time of the alleged agreement relating to the 25% interest in the California business that interest was worth $10,000, it follows that the jury must have allowed recovery to defendant based upon that counterclaim, but only after first deducting the original amounts of the two promissory notes, in the total sum of $4,000. Cf. *Powder Valley State Bank v. Huddelson,* 74 Or 191, 194, 144 P 494 (1914).

■ As for the refusal to instruct that plaintiff was not responsible for debts of the corporation unless such a promise was in writing, as required by the Statute of Frauds in Oregon, ORS 41.580(2), it suffices to point out that the statute has no application where the oral promise has been performed. Thus, in this case, defendant Sturgeon testified that he performed his part of the oral agreement under which he was to be paid a bonus of $12,000 by plaintiff. *Osburn v. DeForce,* 122 Or 360, 373, 257 P 685, 689 (1927). See also, *Kneeland v. Shroyer,* 214 Or 67, 82, 328 P2d 753 (1958).

Finally, the trial court did not err in refusing to grant plaintiff's motion for directed verdict on defendant's third counterclaim.

The ground relied upon by plaintiff in support of this contention, as stated in his assignment of error, is that "there was no evidence of the measure of damages, if any, defendants may have suffered." In sup-

port of this assignment it is argued that the damages which may be recovered for the breach of a contract are only those which arise naturally from the breach, such as may reasonably be supposed to have been in the contemplation of the parties at the time they made the contract as the probable result of its breach, citing the old English case of *Hadley v. Baxendale*, 9 Exch 341, 156 Eng Rep 145 (1854), and that the measure of damages for the breach of a contract requiring the delivery of stock of a corporation is the market value of the stock on the date on which the stock is to be delivered, less the value of the money or services to be given in exchange for the stock.

■ This is a variation of the well established rule that the measure of damages to the purchaser for breach of a contract by the seller for the sale of stock is the difference between the market value of the stocks at the time of delivery and the contract price to be paid for such stock. See 78 CJS 228, Sales § 543. See also, *Philippi v. Pacific Grains, Inc.*, 225 Or 57, 60, 356 P2d 438 (1960).

■ This case does not involve a contract for the *sale* of stock, and the stock of such a small, family owned corporation may not have a market value, at least as stock. It does not follow, however, that one who has been damaged as a result of the breach of a contract to deliver such stock should be left without a remedy.

Thus, this court held, as early as *Hockersmith v. Hanley*, 29 Or 27 at 36, 44 P 497 (1896), applying the rule of *Hadley v. Baxendale*, that:

> "It may be stated as a general rule, that the measure of damages for the breach of an executory contract to sell and deliver is the difference between the contract price and the market price of

the goods bargained for at the time and place of the contemplated delivery. The reason of the rule is that the purchaser may, if the vendor fails in delivery, go into the market, and supply himself with such goods as he had contracted for; and thus it is that, if the market price exceeds the contract price, he would be directly injured by the amount of the difference. This difference he could recover as damages. But the rule fails of application when there is no market at the place of delivery, and the goods are bought for resale at a distant market, and this fact was known to the vendor at the time of entering into the contract: 1 Sutherland on Damages (2d ed.), 116."

In such a case, as held at pp 38-39:

"The intention of the parties is to be ascertained from a consideration of the contract taken, in connection with the surrounding circumstances and conditions of which they are cognizant; and, if the circumstances and conditions are such as to make it apparent that the contract was entered into and known by the contracting parties to have been consummated to enable one of them to serve or accomplish a particular purpose, the liability of the other for its violation will be determined, and the damages ascertained with reference to the effect of the breach, in hindering or defeating the contemplated object. They must also be certain, and flow directly and naturally from the breach; or, to put it in another way, they must not be the remote, but the proximate, consequence thereof, and not speculative or contingent * * *."

■ Also, it is established that when the goods involved in the breach of a contract for delivery of personal property have no market value, the value of such goods is to be determined by the best evidence available. See 78 CJS 231, Sales § 545. See also, 46 Am Jur 807, 811, Sales §§ 679, 683.

In this case it was testified by several witnesses, including plaintiff himself, that what plaintiff was to give to Mr. Sturgeon, in exchange for his services performed, was a "25% interest" in the trailer manufacturing business, which he had just purchased for $40,000—"25% of Pan-Pacific Homes", as stated by plaintiff.

According to defendant's testimony, this agreement was made in late 1967, and "at Christmas time", in California, plaintiff promised that in early January he would have his attorney in Burns draw up the necessary papers for transfer of the stock. Plaintiff, when asked how much the 25% interest was worth at the time of his agreement with Mr. Sturgeon, agreed that "it would be a fair statement to say that 25% of Pan-Pacific *at that time* would have been *worth $10,000*." (Emphasis added)

■ From this evidence the jury was thus entitled to find that even though this corporate stock may have had no "market value", as between the parties it was considered as having a value of $10,000 at the time of the agreement in late 1967. The jury was also entitled to find that it was intended by the parties that the stock, or other papers confirming transfer of a 25% interest in the business, was to be delivered by plaintiff to Mr. Sturgeon in January, 1968, and that, in the absence of any evidence of change of conditions during that short period of time, the 25% interest in the business was still worth $10,000.

■ Such a result is completely in accord with the rule that evidence of the price previously paid for the same personal property, where not too remote in time and place and where the conditions affecting value have not materially changed, is some evidence of its subsequent value. *Barber v. Motor Investment Co.*, 136 Or

361, 368, 298 P 216 (1931); *Mattechek v. Pugh*, 153 Or 1, 12, 55 P2d 730 (1936).

It is true that plaintiff testified that the California business never had any value and that it was insolvent at the time of the trial in 1969, more than a year after the original agreement. But the jury was entitled to disbelieve such testimony, particularly in view of plaintiff's admission that he had transferred $54,000 to Pan-Pacific from his automobile business in Burns (including the $40,000 purchase price) and in view of testimony that he had also pocketed other cash received by his automobile business as "a way to beat the United States out of a buck or two."

■ As for the value of the services to be performed by defendant in exchange for the stock, as an amount to be deducted from the value of the stock in arriving at what plaintiff contends to be the proper measure of defendant's damages, it should suffice to point out that the jury was entitled to find from the evidence that all, or substantially all, of the services to be performed by defendant Loren Sturgeon under his agreement with plaintiff were performed by him. Indeed, there is authority for the proposition that where the consideration for stock has been paid and that stock has no market value, the measure of damages for failure to deliver the stock is the real or actual value of the stock at the time when it should have been delivered. 46 Am Jur 807, Sales § 679.

In other words, under all of the evidence in this case the jury was entitled to find that what the parties intended when they made their agreement was that, regardless of the value of the services to be performed by Mr. Sturgeon, in consideration for his promise to perform such services, he was to receive an immediate transfer of a 25% interest in Pan-Pacific, worth

$10,000, and that since plaintiff performed all, or substantially all, of the services to be performed by him under the agreement, it was "within the contemplation of the parties" (to apply the rule of *Hadley v. Baxendale*) that in the event of a breach of that agreement by plaintiff, Mr. Sturgeon would be entitled to payment of damages in the sum of $10,000 (less the $4,000 owed by him on the two notes). For the same reasons, the jury was entitled to find that such damages were not "remote" or "speculative", but were the "proximate consequences" of such a breach.

Furthermore, at the time of trial, insofar as shown by the record brought to this court, plaintiff requested no instructions under which the jury might have been informed of the various requirements to be satisfied in order to permit recovery under the measure of damages subsequently urged by him in his brief on this appeal, and no exceptions were taken by him to the instructions as given by the trial judge on the general subject of damages. Similarly, plaintiff's motion for directed verdict on defendant's third counterclaim was based solely on the grounds that "there is no evidence * * * or insufficient evidence as to the value of the stock" and that "there is no evidence that defendant performed as required", thus raising only the question of the sufficiency of the evidence on these two points. And of these points only the issue of the market value of the stock at the time of the breach (i.e., the time of its promised delivery) is raised under plaintiff's assignment of error on this appeal.

For all of these reasons we conclude that the trial judge did not err in denying plaintiff's motion for directed verdict on defendant's third counterclaim.

Affirmed.