795 F.2d 1417
 TWIN CITY FIRE INSURANCE CO., Plaintiff-Appellee-Cross-Appellant,
v.
PHILADELPHIA LIFE INSURANCE CO., Defendant,
and
Rask & Associates, et al., Defendants-Appellants-Cross-Appellees.
RASK & ASSOCIATES, et al., Third-Party Plaintiffs-Appellants,
v.
John L. GRIFFITH, et al., Third-Party Defendants-Appellees.
 Nos. 85-3906, 85-3907.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 9, 1986.
Decided July 29, 1986.
 
 Andrew R. Gardner, Richard S. Gleason, Stoel, Rives, Boley, Fraser & Wyse, John R. Faust and Mildred Carmack, Schwabe, Williamson, Wyatt, Moore & Roberts, Portland, Or., for Twin City Fire Ins. Co.
 Andrew Chenowith and Fred Kopatich, Allen, Kilmer, Schrader, Yazabeck & Chenowith, Portland, Or., for Rask & Associates, et al.
 Appeal from the United States District Court for the District of Oregon.
 Before ALARCON, REINHARDT and THOMPSON, Circuit Judges.
 THOMPSON, Circuit Judge:
 
 
 1
 Lee M. Rask ("Rask") appeals from the district court's (a) entry of directed verdict in favor of Twin City Fire Insurance Co. ("Twin City") on Twin City's breach of contract claim; (b) entry of directed verdict in favor of John L. Griffith ("Griffith") and St. Paul Insurance Co. and St. Paul Risk Services, Inc. ("St. Paul") on Rask's claim for indemnity; (c) denial of Rask's motion for directed verdict in his favor on Twin City's contract, promissory estoppel, and negligence claims, and; (d) pretrial determination that Rask was precluded from raising, at trial, mistake and impossibility as defenses to Twin City's contract claim.
 
 
 2
 Twin City appeals from the district court's entry of summary judgment against it on its claim for attorney's fees against Philadelphia Life Insurance Co. ("Philadelphia Life").
 
 
 3
 We affirm in part and reverse in part.
 
 
 4
 * FACTS AND PRIOR PROCEEDINGS
 
 
 5
 In January 1982 Douglas Powell was severely injured in Oregon by a power line owned by Pacific Power & Light Co. ("Pacific"). Officials at Pacific believed the company faced a substantial liability and entered into settlement negotiations with Powell's attorney. Pacific was self-insured up to $1 million. Twin City was Pacific's excess liability carrier and was responsible for payment of any loss over $1 million on the Powell claim. Pacific contested the amount of damages but conceded liability for settlement purposes.
 
 
 6
 Sam Witters ("Witters") was Pacific's litigation coordinator. He had handled numerous claims for personal injuries, and had successfully settled many of them by negotiating "structured settlements" (settlements providing deferred payments over a number of years). Offering annuities in structured settlements allowed Pacific to avoid the present dollar cost of the full settlement and to take advantage of certain tax benefits. Accepting annuities permitted claimants to receive a steady income over a period of time and thereby achieve a measure of long-term security. Witters determined that Powell might be interested in accepting an annuity as part of a structured settlement of his claim.
 
 
 7
 In June 1982 Witters contacted appellant Rask to procure quotes on various types of annuities from insurance companies. Rask owned Rask & Associates, an insurance brokerage firm, and held brokerage licenses in four states including Oregon. Approximately thirty to thirty-five percent of Rask's business came from commissions earned in procuring annuities in structured settlements. Because of the increased use of annuities in structured settlements and the complexity of the annuity market, Rask had developed a profitable specialty in this field. Typically, a client would provide Rask with medical information and general guidelines on the type of annuity desired, and Rask would submit this information by phone to one or more insurance companies for a price quotation. The insurance company would provide a quote and Rask would, in turn, relay the information to the client. Because a client requesting an annuity quote was usually involved in negotiating a settlement, Rask was often asked to produce quotes on short notice. Rask typically obtained the quotes via telephone.
 
 
 8
 Witters had used Rask's services about a dozen times. In previous dealings, Witters would give Rask medical information and guidelines and Rask would provide quotes on prices by telephone. Witters had used the quotes in arranging several settlements, and the insurance companies always issued the annuities for the prices quoted by Rask. Rask never informed Witters that he should not rely on verbal price quotations.
 
 
 9
 On six occasions Rask had used the services of John Griffith, an agent for St. Paul. Griffith was also a general agent for Philadelphia Life and had acquired an expertise in the annuity business. When Rask used Griffith's services, he would gather data from the client and pass that on to Griffith who would then obtain telephone quotes from an insurance company. Griffith would relay the information back to Rask who would provide the information by telephone to the client. When the annuity was issued, Griffith would receive a commission (typically four percent) from the annuity company issuing the annuity, and he and Rask would split the commission.
 
 
 10
 When Witters asked Rask to provide annuity quotes for the Powell case, Rask contacted Griffith. Witters never dealt directly with Griffith, but Rask wrote Witters that he was using Griffith's services.
 
 
 11
 Between December 1982 and mid-February 1983 Witters requested several quotes from Rask in connection with the Powell case. Rask relayed the requests to Griffith and received from Griffith several quotes which he conveyed to Witters. Relying on the quotes, Witters made several offers to Powell's attorney. The largest offer discussed was a combination of cash and annuities which had an aggregate cost to Pacific and Twin City of $1.6 million. Powell's attorney rejected this and other offers. His objections, however, were primarily to the design of the annuities offered. Both Witters and Powell's attorney felt the parties were "close" to a settlement.
 
 
 12
 In February 1983 Witters asked Rask to obtain quotes on a deferred annuity which would cost around $200,000. Witters phoned Rask several times expressing a sense of urgency and stating that the quotes were needed immediately because he and Powell's attorney were close to reaching a settlement. Rask, in turn, telephoned Griffith several times over a period of two-to-four days asking Griffith to provide quotes for the type of annuity requested. Griffith informed Rask that he had attempted to obtain quotes from Philadelphia Life (which both Griffith and Rask believed offered the lowest rates on deferred annuities), but that Griffith had been unable to contact anyone at Philadelphia Life.
 
 
 13
 Finally, in a telephone conversation, Griffith provided Rask with a quote from Philadelphia Life for the annuity. Its price was approximately $200,000. Rask's and Griffith's versions of this conversation differed. Rask testified that Griffith informed him the quote had not been confirmed by Philadelphia Life, and that Griffith had calculated the quote "at his own office." Rask, however, recalled that Griffith stated he was "comfortable" with the number. Rask thought "comfortable" meant that Philadelphia Life would issue the annuity for the price quoted by Griffith. Griffith testified (by deposition excerpt) that Rask had made several "desperation calls" asking for a quote; that Rask had asked for a "ballpark figure," and Griffith had calculated an estimate, but that he had told Rask not to relay the figure to Witters until Philadelphia Life provided confirmation.
 
 
 14
 Rask then called Witters. Rask and Witters also provided conflicting accounts of their conversation. Rask testified he told Witters the quote had not been confirmed. However, Rask conceded he told Witters that he was "comfortable" with the quote and that Witters could rely on it (i.e., use the quote in the Powell settlement). Witters testified Rask had said that he had "difficulty" in getting the quote, but Witters did not recall the nature of the difficulty. Witters did recall that he told Rask he was in the middle of negotiations and when he asked Rask if he could rely on the quote Rask said "yes."Shortly thereafter, Powell, through his attorney, and Pacific, through Witters, agreed on a settlement (the "February Settlement"). The combined cash and annuity cost of the settlement to Pacific and Twin City was approximately $1.77 million. The deferred annuity quoted by Rask was included in the settlement. Witters called Rask to tell him the case had been settled and that Pacific would purchase the deferred annuity. Rask stated he considered the annuity "sold" at that point, and told Griffith to order the annuity from Philadelphia Life. During the following week, Rask assured Witters he would obtain the annuity.
 
 
 15
 About one week later, Griffith told Rask that Philadelphia Life could not issue a deferred annuity in Oregon because it had not submitted a required form to Oregon's Insurance Commissioner. Griffith later told Rask that Philadelphia Life did not write deferred annuities. Rask relayed this to Witters and told him he would try to find another annuity "close" in cost and benefits. Witters, in turn, informed Powell's attorney that the annuity could not be obtained at the anticipated cost. Powell's attorney replied that Pacific and his client had entered into a binding settlement agreement and that he expected "them to stand behind the offer regardless of the cost." He also told Witters that Powell would consider other offers, "so long as [they] didn't diminish in any way the value of the annuity that was offered to Mr. Powell."
 
 
 16
 Thereafter, Rask and Witters attempted to find a comparable deferred annuity. Witters offered Powell several alternative annuity and cash packages, but Powell rejected them because they were not as favorable as that offered in the February Settlement. Finally, Witters offered and Powell accepted a cash and deferred annuity package which provided benefits comparable to the value of the cash and annuity agreed to in the February Settlement. The overall cost of the final settlement was approximately $260,000 more than the original settlement. As the excess carrier liable for all payments over $1 million, Twin City paid the additional $260,000 cost of the settlement.
 
 
 17
 In December 1983 Twin City filed the present action in federal district court against Philadelphia Life, Rask & Associates, Inc. and Rask, seeking to recover the additional $260,000 it paid toward the settlement. Twin City alleged causes of action for breach of contract, negligence and promissory estoppel based upon the failure of the defendants to provide the lower-costing deferred annuity. Rask filed a third party claim against Griffith and St. Paul, and a cross-claim against Philadelphia Life, seeking indemnification and contribution. Philadelphia Life asserted similar claims against Griffith and Rask. The parties stipulated prior to trial that Twin City was the real party in interest and could assert all claims which could have been asserted by Pacific.
 
 
 18
 In a pretrial ruling, the district court determined that Rask was not entitled to a discharge from Twin City's breach of contract claim on the basis of mistake and impossibility, and was precluded from raising those defenses at trial. The district court also held that Twin City would not be entitled to recover attorney's fees from Philadelphia Life.
 
 
 19
 Trial of the case began before a jury. At the close of Twin City's case, Rask moved for a directed verdict on Twin City's breach of contract, negligence and promissory estoppel claims. The court denied that motion. Following Rask's presentation of evidence, Twin City moved for a directed verdict on its breach of contract and promissory estoppel claims against Rask. Griffith moved for a directed verdict on Rask's claims for indemnification and contribution. The court granted Griffith's motion, determining that Rask was not entitled to either indemnification or contribution from Griffith or St. Paul. The district court also granted Twin City's motion for directed verdict against Rask on Twin City's breach of contract claim.
 
 
 20
 Judgment was subsequently entered in favor of Twin City and against Rask for $259,900 plus pre-judgment interest of $52,389.67. Judgment was also entered dismissing Twin City's claim against Philadelphia Life, and Rask's claim for indemnification and contribution against Griffith, St. Paul and Philadelphia Life, and granting judgment in favor of Philadelphia Life on its indemnification claim against Griffith and St. Paul.
 
 II
 ISSUES
 
 21
 We review the following decisions of the district court:
 
 
 22
 A. Granting Twin City's motion for directed verdict in its favor on its breach of contract claim against Rask.
 
 
 23
 B. Denying Rask's motions for directed verdict against Twin City on Twin City's contract, negligence and promissory estoppel claims.
 
 
 24
 C. Precluding Rask, by pretrial order, from raising at trial the defenses of mistake and impossibility.
 
 
 25
 D. Granting directed verdict in favor of Griffth and St. Paul against Rask on Rask's claim for indemnification.
 
 
 26
 E. Denying by entry of summary judgment Twin City's claim for attorney's fees against Philadelphia Life.
 
 III
 JURISDICTION AND STANDARD OF REVIEW
 
 27
 Jurisdiction was properly vested in the district court under 28 U.S.C. Sec. 1332. Because this case involves multiple parties and claims and the district court did not certify that its pretrial decisions were final judgments, we may review the district court's pretrial decisions appealed by the parties. See, e.g., Baker v. Limber, 647 F.2d 912, 916 (9th Cir.1981); Fed.R.Civ.P. 54(b).
 
 
 28
 The standard of review of the propriety of a directed verdict is the same on appeal as it is in the trial court. Othman v. Globe Indemnity Co., 759 F.2d 1458, 1463 (9th Cir.1985). A directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict. Shakey's, Inc. v. Covalt, 704 F.2d 426, 430 (9th Cir.1983). It is not proper if there is substantial evidence to support a verdict for the non-moving party. Id. We consider all of the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. Id. See also Fabrica, Inc. v. El Dorado Corp., 697 F.2d 890, 892 (9th Cir.1983). Federal law guides this interpretation. Othman, 759 F.2d at 1463.
 
 
 29
 We review de novo the district court's pretrial ruling that Rask could not raise, at trial, the defenses of mistake and impossibility. Grigsby v. CMI Corp., 765 F.2d 1369, 1373 (9th Cir.1985).
 
 IV
 ANALYSIS
 
 30
 A. Twin City's Breach of Contract Claim Against Rask
 
 
 31
 Both Twin City and Rask argue that Twin City's breach of contract claim may be resolved by the court as a matter of law. We disagree. Our standard for directed verdict precludes judgment as a matter of law where, as here, both parties have presented substantial evidence to support their contentions. See generally Fabrica, 697 F.2d at 892. Further, we have recognized that "[i]t is the exclusive function of the jury to weigh the credibility of the witnesses, resolve evidentiary conflicts, and draw reasonable inferences from the established facts." United States v. Horowitz, 756 F.2d 1400, 1406 (9th Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 74, 88 L.Ed.2d 60 (1985). This case clearly implicates all of these functions.
 
 
 32
 1. Application of the Facts and Law to the Legal Standard
 
 
 33
 Rask presented substantial evidence from which a jury could conclude that, in the Powell transaction and on prior occasions, he only served as an intermediary or conduit to relay annuity information from insurance companies to Witters. Witters testified that on prior occasions Rask's role in procuring annuities had been to search the marketplace and report to Pacific on the availability of annuities. Witters testified "we would tell Mr. Rask what that money was and ask him to check the market or search the market to see what the best benefits that we could provide for that money." Witters also stated he "would notify [Rask] that it had been accepted and I would order the annuity policies, and [Rask] would ask me to send a check to pay the premium like always." Witters conceded he knew Rask was using the services of Griffith who, in turn, was obtaining quotes from Philadelphia Life.
 
 
 34
 Further, Rask presented substantial evidence that although he advised Witters to rely on the quoted annuity, he did not make an unconditional promise to procure the annuity. Witters never testified that Rask had expressly promised to produce the annuity quoted by Griffith. Rather, Witters stated "I just assumed that whoever--wherever he had gotten them had the authority to give them to me and I was comfortable in using them, that's the extent of my concern about the--how good the figures were." Witters testified he knew Rask had had difficulty in obtaining the quote. Finally, Rask testified he told Witters the quote had not been confirmed, and that Witters had "pressured him" to provide the Philadelphia Life quote.
 
 
 35
 We believe the foregoing constitutes "substantial evidence" from which a jury could conclude Rask only facilitated the conveyance of information from Griffith to Witters, but did not unconditionally promise to procure the Philadelphia Life annuity. Rask's statement to Witters that he could "rely" on the quote may have been nothing more than advice from an intermediary to a sophisticated claims representative well-experienced in the uncertainties accompanying structured settlement negotiations.
 
 
 36
 Twin City also presented substantial evidence from which a jury could conclude the converse. Twin City correctly notes that under Oregon law a contractual promise may be inferred from conduct and need not be expressly stated. See, e.g., Southworth v. Oliver, 284 Or. 361, 369, 587 P.2d 994, 998 (1978); Owen v. Bradley, 231 Or. 94, 103, 371 P.2d 966, 970 (1962); Hamacher v. Tumy, 222 Or. 341, 350, 352 P.2d 493, 498 (1960). Further, the practical construction of the contract given by the parties is "extremely persuasive" in construing the contract. Brown v. Eoff, 271 Or. 7, 13, 530 P.2d 49, 51 (1975). A jury could reasonably conclude that Rask had entered into a contract to provide the Philadelphia Life annuity at two different points in his dealings with Witters. First, Rask may have promised to deliver the annuity when he quoted the annuity and told Witters he could rely on the quote. In prior dealings, Witters had used Rask's quotes and they had always proven reliable. Rask testified it was customary for clients to rely on verbal price quotes and not to wait for confirmation from the insurance company. Further, Rask knew that Pacific had used these quotes on previous occasions in entering binding settlement agreements. Given the complexities of the annuity market, the prior dealings between the parties, and the assurances from Rask, a jury could reasonably conclude that Rask had made an unconditional promise to deliver the Philadelphia Life annuity at the stated price in exchange for Pacific's return promise to take the policy and pay the premium (conditioned upon Pacific settling Powell's claim). See, e.g., Jump v. Manchester Data Sciences Corp., 424 F.Supp. 442, 445 (E.D.Mo.1976) (valid contractual promise may be conditioned upon uncertain events); Wilson v. Continental Body Corp., 93 Ill.App.3d 966, 970, 49 Ill.Dec. 412, 415, 418 N.E.2d 56, 59 (1981) (same); 1 A. Corbin, Corbin On Contracts Sec. 148, at 645 (1963) [hereinafter Corbin ]. Second, Rask may have promised to deliver the annuity when Witters entered into the February Settlement and Rask allegedly agreed to secure the annuity from Philadelphia Life. Rask stated he considered the annuity "sold" and he assured Witters the annuity would be delivered.
 
 2. Legal Arguments
 
 37
 Rask and Twin City advance several legal arguments as to why Twin City's breach of contract claim should be decided as a matter of law. Both sides seek to mitigate unfavorable evidence by arguing that Oregon law establishes per se rules which transcend the facts of this case and dictate an outcome one way or the other. Because the parties have raised these arguments on appeal and would reassert them on remand if not addressed, we turn to these arguments. We also address the district court's ruling precluding Rask from presenting the defenses of mistake and impossibility.
 
 
 38
 a. The "Insurance Procurement" Cases
 
 
 39
 Oregon law defines an annuity as insurance. Or.Rev.Stat. Secs. 731.102(2), 731.154 (1985). Twin City argues that, under Oregon law, an agent or broker who undertakes to procure insurance and fails to do so is liable for all resulting damages, even if he or she used reasonable care and exercised best efforts. Twin City argues that it need not establish that Rask expressly promised to deliver the Philadelphia Life annuity, because Oregon law imposes this duty in insurance procurement contexts; it need only establish that Rask and Pacific agreed upon the terms of the annuity. Rask responds that Oregon law only imposes a duty to use reasonable care.
 
 
 40
 We note initially that the "insurance procurement" cases provide only an analogy to this case. In the typical insurance procurement setting, the agent has failed to procure the insurance, the plaintiff suffers a loss (i.e., fire, theft) for which he or she should have been insured, and the plaintiff sues the agent for the loss. See, e.g., 64 A.L.R.3d 398, 410-12 (1975) (and cases cited). See also Clements v. Thornton, 268 Or. 367, 520 P.2d 893 (1974); Franklin v. Western Pacific Insurance Co., 243 Or. 448, 414 P.2d 343 (1966). In those cases, the plaintiff has suffered an uninsured loss by relying on the agent's undertaking to procure the insurance. 1A Corbin, supra Sec. 209, at 645. The plaintiff sues to recover damages sustained in reliance upon such undertaking. See E. Farnsworth, Contracts Sec. 2.19, at 97 (1982). In the present case, Twin City alleges it suffered a loss or "reliance damages" when it entered into the February Settlement in reliance on the Rask quote and then had to pay more for a comparable annuity. If Twin City can demonstrate that it suffered reliance damages (and not merely a lost "expectation" or "benefit of the bargain"),[1] then the present case would indeed be similar to the paradigmatic "insurance procurement" case.
 
 
 41
 However, we do not agree with Twin City that an agent who undertakes to procure insurance always unconditionally promises to procure a policy. In Joseph Forest Products, Inc. v. Pratt, 278 Or. 477, 564 P.2d 1027 (1977), the Oregon Supreme Court indicated that an agent or broker is obligated to exercise reasonable care, but the court did not establish the per se liability rule suggested by Twin City:
 
 
 42
 'An insurance broker is the agent of the insured in negotiating for a policy, and owes a duty to his principal to exercise reasonable skill, care, and diligence in effecting insurance. Thus he may be held liable where he has breached a contract to procure insurance for his principal. And while such broker is not obligated to assume the duty of procuring a policy, without consideration for his promise, he must exercise ordinary care in the performance of such duty when assumed, the promise to take the policy being a sufficient consideration. He is charged with the exercise of reasonable care and skill in making inquiries and obtaining information concerning the responsibility of the insurer with whom they place the risk, and is liable for any loss occasioned by such want of care.'
 
 
 43
 Id. at 480-81, 564 P.2d at 1029 (quoting 16 Appleman, Insurance Law and Practice Sec. 8841, 510-14 (1968)). See also Rodgers Insurance Agency v. Anderson Machinery Corp., 211 Or. 459, 468, 316 P.2d 497, 501 (1957) (agent or broker liable for "unjustifiable" breach). Numerous courts in other jurisdictions have expressly stated that a broker or agent will be liable for breach of contract and negligence where he or she fails to exercise reasonable care. See, e.g., Consolidated Sun Ray, Inc. v. LEA, 276 F.Supp. 132, 136 (E.D.Pa.1967), aff'd, 401 F.2d 650 (3rd Cir.1968), cert. denied, 393 U.S. 1050, 89 S.Ct. 688, 21 L.Ed.2d 692 (1969); Russell v. Reliance Insurance Co., 672 S.W.2d 693, 694 (Mo.App.1984). However, the courts have also stated that whether an agent or broker has made an unconditional promise to deliver an annuity depends upon the facts of the case. See, e.g., Wheaton National Bank v. Dudek, 59 Ill.App.3d 970, 972-73, 17 Ill.Dec. 487, 489, 376 N.E.2d 633, 635 (1978); Oney v. Barnes, 5 Ariz.App. 460, 462, 428 P.2d 124, 126 (1967).[2] We have already ruled that the trier of fact must make this determination.
 
 
 44
 b. The Nature of the Promise
 
 
 45
 Rask argues that to prevail on its breach of contract action, Twin City must prove that Rask not only promised to deliver the Philadelphia Life annuity, but that he also agreed to bear Pacific's entire added expense if it had to acquire a comparable annuity package elsewhere. In other words, Rask argues that Twin City must prove he agreed to accept liability for the more expensive annuity. We do not agree.
 
 
 46
 The imposition of contract-market price damages does not depend upon an agreement (express or implied) between the parties that such damages will be imposed upon breach. See Restatement Contracts, supra 351, Comment a ("[T]he party in breach need not have made a 'tacit agreement' to be liable for the loss. Nor must he have had the loss in mind when making the contract...."). See generally Grover v. Sturgeon, 255 Or. 578, 585, 469 P.2d 617, 620-21 (1970); American Oil Pump & Tank Co. v. Foust, 128 Or. 263, 269-70, 274 P. 322, 325 (1929); Farnsworth, Legal Remedies for Breach of Contract, 70 Colum.L.Rev. 1145, 1201 (1970). A manufacturer who promises to deliver a good and breaches that contractual obligation may not prevent the imposition of benefit of the bargain damages by arguing that he never agreed to accept liability for the failure to deliver the good. Liability for damages results not from the agreement to assume liability, but from the promise to deliver the good.[3] This is the "first rule" of Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145 (1854), and our examination of Oregon law reveals that the Oregon courts have followed this fixed principle of contract law. See, e.g., Grover, 255 Or. at 585, 469 P.2d at 620-21. By the same token, an agent who purports to enter into a contract in his capacity as an agent and promises to deliver a good or service may be liable for damages without a showing that he agreed to accept liability. See generally Restatement (Second) of Agency Sec. 329 (1958). See also University Marketing & Consulting Insurance Co. v. The Hartford Life & Accident Insurance Co., 413 F.Supp. 1250, 1263-64 (E.D.Pa.1976); Smith & Edwards v. Golden Spike Little League, 577 P.2d 132, 134 (Utah 1978); Cousin v. Taylor, 115 Or. 472, 477-78, 239 P. 96, 97-98 (1925).
 
 
 47
 Rask's liability (if any), therefore, depends upon what he promised to do, and not the liability he agreed to accept. Rask may have only agreed to search the marketplace, report back, advise, facilitate, and use reasonable efforts. Alternatively, he may have unconditionally promised to deliver the Philadelphia Life annuity at the quoted price. Finally, it is conceivable that Rask did not make any promise, but that Witters acted precipitously and without reason in relying on the unconfirmed quote.
 
 
 48
 We hold that these questions should have been resolved by the jury.
 
 
 49
 c. The Adequacy of the Consideration
 
 
 50
 Rask argues that Twin City failed to present substantial evidence that Rask's undertaking to procure the Philadelphia Life annuity was supported by consideration. He contends the commission (four percent divided between Griffith and himself) does not "support" a liability of $260,000.
 
 
 51
 Rask misconceives the requirement of consideration. Under Oregon law and elsewhere valid consideration may consist of a bargained-for benefit to the promissor or a bargained-for detriment to the promisee. See, e.g., Cummings v. Central Oregon Bank, 110 Or. 101, 103, 223 P. 236, 237 (1924). Twin City presented substantial evidence that Rask would receive a bargained-for benefit (by way of commission), and that Pacific incurred a bargained-for detriment by dealing exclusively with Rask. See, e.g., 64 A.L.R.3d at 406, 433-36 (1975). See also Clements, 268 Or. at 375, 520 P.2d at 897 (jury may be instructed that implied agreement to pay premium when billed may be sufficient consideration); Pacific Pines Construction Corp. v. Young, 257 Or. 192, 477 P.2d 894 (1970) (passim) (implied promise to use best efforts may provide consideration). The Oregon courts have stated that if consideration is found, they will not inquire into the "adequacy" or comparative value of the bargain in actions at law. Van Horn Construction Corp. v. Joy, 186 Or. 473, 489, 207 P.2d 157, 164 (1949); Biersdorf v. Putman, 181 Or. 522, 549-50, 182 P.2d 992, 1004, (1947).
 
 
 52
 The size of the commission is relevant to whether Rask in fact promised to deliver the Philadelphia Life annuity. A jury might conclude that given the size of the commission Rask only agreed to use his best efforts to find a suitable annuity, but did not promise to deliver the annuity. On the other hand, perhaps Rask was so anxious to earn the commission and so sure the annuity would be issued that he unconditionally promised to deliver the annuity at the quoted price. Again, these matters should be resolved by the jury.
 
 
 53
 d. The Defenses of "Mistake" and "Impossibility"
 
 
 54
 In a pretrial motion, Rask asked for summary judgment on Twin City's breach of contract claim arguing that his contractual obligations, if any, were discharged by reason of mutual mistake and impossibility. In its Order dated and filed April 4, 1985, the district court held as a matter of law that Rask was not entitled to a discharge from liability on these defenses, and was "precluded from raising ... [them] at the time of trial." We hold that Rask should have been permitted to raise, at trial, defenses of mistake and impossibility.
 
 1. Mistake
 
 55
 Under Oregon law, where the parties to a contract make a mutual mistake as to a basic assumption underlying the agreement, the "contract is voidable by the adversely affected party unless he bears the risk of mistake...." Restatement Contracts, supra Sec. 152. See Crown Northwest Equipment, Inc. v. Drake Co., 49 Or.App. 679, 684-85, 620 P.2d 946, 950 (1980). A party bears the risk of mistake where, among other things, he was "aware that his knowledge was limited but undertook to perform in the face of that awareness...." Restatement Contracts, supra Sec. 154, Comment c. See Gardner v. Meiling, 280 Or. 665, 675, 572 P.2d 1012, 1017 (1977); Farnsworth v. Feller, 256 Or. 56, 62-63, 471 P.2d 792, 796 (1970). Rask presented a genuine issue as to these elements. Rask and Witters testified that both assumed the desired Philadelphia Life annuity could be purchased in Oregon. As it turned out, that was incorrect. Although one might characterize this as a "mistake of law," we do not believe that the Oregon courts have established a per se rule rejecting this type of mistake as a valid defense. See Farnsworth, 256 Or. at 62-63, 471 P.2d at 796 (rejecting a per se rule); D. Calamari & J. Perillo, Contracts Sec. 9-28, at 308-09 (1977) (modern trend rejects this distinction). Further, the availability of the annuity in Oregon was arguably "fundamental to the performance of the contract." Crown Northwest Equipment, 49 Or.App. at 685, 620 P.2d at 950. See also Shopping Centers of America, Inc., v. Standard Growth Properties, Inc., 265 Or. 405, 408, 498 P.2d 781, 785 (1972), on reh'g, 265 Or. 417, 509 P.2d 1189 (1973).
 
 
 56
 Finally, Rask presented a material issue as to whether Rask and Witters acted with limited knowledge. Rask testified that he told Witters the numbers were not confirmed, and that Witters had pressured him to produce a quote. Witters conceded Rask had said he had had "difficulty" in getting the quote. Nevertheless, Witters relied upon the quote in entering into the February Settlement with Powell.
 
 2. Impossibility
 
 57
 Rask also presented substantial evidence in support of the defense of impossibility. The Restatement Second provides:
 
 
 58
 (1) Where, at the time a contract is made, a party's performance under it is impracticable without his fault because of a fact of which he has no reason to know and the non-existence of which is a basic assumption on which the contract is made, no duty to render that performance arises, unless the language or circumstances indicate the contrary.
 
 
 59
 Restatement Contracts, supra Sec. 266. See generally Portland Section of Council of Jewish Women v. Sisters of Charity, 266 Or. 448, 456-58, 513 P.2d 1183, 1188 (1973); Savage v. Peter Kiewit Sons' Co., 249 Or. 147, 152-53, 432 P.2d 519, 522-23 (1967), modified, 249 Or. 158, 437 P.2d 487 (1968). Rask testified that he relied on Griffith and relayed Griffith's information and annuity quote to Witters. Griffith was Philadelphia Life's general agent, and Rask was relying on him. Rask presented a triable issue as to whether he had reason to know that the desired annuity could not be issued by Philadelphia Life in Oregon and whether he was without fault. The availability of the Philadelphia Life annuity in Oregon was arguably a basic assumption upon which the alleged contract was made. Further, the district court should have addressed, at trial, whether the cost of providing an alternative annuity would have imposed a "hardship ... so extreme as to be outside any reasonable contemplation of the parties." Council of Jewish Women, 266 Or. at 457-58, 513 P.2d at 1188 (quoting Savage, 249 Or. at 152, 432 P.2d at 522) ). See also Taylor-Edwards Warehouse & Transfer Co. v. Burlington Northern, Inc., 715 F.2d 1330, 1336 (9th Cir.1983) (citing the common law rule stated in Kiyoichi Fujikawa v. Sunrise Soda Water Works Co., 158 F.2d 490, 493 (9th Cir.1946), cert. denied, 331 U.S. 832, 67 S.Ct. 1511, 91 L.Ed. 1846 (1947) that extreme hardship is not sufficient to excuse non-performance on the ground of impossibility, but noting a trend in "[m]ore modern cases" to allow the defense where performance would be extremely costly or onerous although not literally impossible).
 
 3. Applying the Defenses
 
 60
 The district court by its pretrial ruling precluded Rask: (a) from presenting the defenses of mistake and impossibility to the court after presentation of the evidence at trial; and (b) from presenting these defenses to the jury in the form of an argument or instruction. Whether the defenses of mistake or impossibility may be presented to a jury presents a novel question. Our research has revealed little authority on this issue.[4] We need not reach this issue, however, because the district court entered a directed verdict for Twin City before the contract claim was presented to the jury. Hence, Rask had no opportunity to present these defenses to a jury, and the district court did not address this issue.
 
 
 61
 We hold only that Rask presented genuine issues of material fact as to the defenses of mistake and impossibility and he should have been able to raise them at trial. On remand, the district court should determine whether these defenses should be resolved as a matter of law by the court, or whether they should be left to the jury for determination. We express no opinion on this issue, as the parties did not present the issue to the district court, nor did they raise, brief or argue it on appeal.
 
 
 62
 B. Denial of Rask's Motions for Directed Verdict On Twin City's Contract, Negligence and Promissory Estoppel Claims
 
 
 63
 We have already determined that both Rask and Twin City presented substantial evidence in support of their respective contentions as to Twin City's contract claim. The district court therefore properly denied Rask's motion for a directed verdict on that claim.
 
 
 64
 The district court also properly denied Rask's motion for a directed verdict on Twin City's promissory estoppel and negligence claims. Both parties presented substantial evidence on these issues.[5] See generally Litman v. Massachusetts Mutual Life Insurance Co., 739 F.2d 1549, 1559 (11th Cir.), reh'g denied, 746 F.2d 815 (1984) (en banc); R.S. Bennett & Co. v. Economy Mechanical Industries, Inc., 606 F.2d 182, 186 (7th Cir.1979) (recovery under promissory estoppel generally presents question of fact). See also Hunt v. United States, 432 F.2d 208, 209 (9th Cir.1970); Merritt Chapman & Scott Corp. v. Fredin, 07 F.2d 370, 372-73 (9th Cir.1962) (issues of negligence generally present questions for jury). We need not review all of the elements necessary to sustain valid claims for negligence and promissory estoppel under Oregon law. We need only address several of the arguments raised by the parties and offer a few comments to guide the district court on remand.
 
 1. Promissory Estoppel
 
 65
 Under Oregon law, recovery under promissory estoppel requires:
 
 
 66
 (1) a promise,
 
 
 67
 (2) which the promissor, as a reasonable person, could foresee would induce conduct of the kind that occurred,
 
 
 68
 (3) actual reliance on the promise,
 
 
 69
 (4) resulting in a substantial change in position.
 
 
 70
 Bixler v. First National Bank, 49 Or.App. 195, 199-200, 619 P.2d 895, 898 (1980) (citing Schafer v. Fraser, 206 Or. 446, 290 P.2d 190 (1956) ).
 
 
 71
 We do not agree with Rask that a "quote" may not amount to a promise for purposes of promissory estoppel. Rather, whether a "quote" is a promise depends upon the particular facts. See Schafer, 206 Or. at 478-79, 290 P.2d at 205 (discussing Northwestern Engineering Co. v. Ellerman, 69 S.D. 397, 10 N.W.2d 879, 883 (1943) ). See generally Drennan v. Star Paving Co., 51 Cal.2d 409, 413-14, 333 P.2d 757, 760-61 (1958); E. Farnsworth, Contracts Sec. 3.25, at 183 (1982). Here, Rask admitted he told Witters he could rely on the quote. Although Rask stated he told Witters the quote was not confirmed (and Witters knew Rask had had "difficulty" in obtaining the quote), Rask's statement that Witters could rely on the quote constitutes substantial evidence that the quote may have been a promise.
 
 
 72
 We also believe Twin City presented substantial evidence to meet the requirement of a "substantial change in position." Bixler, 49 Or.App. at 199-200, 619 P.2d at 898 (1980). Compare Bickerstaff v. Gregston, 604 P.2d 382, 384 (Okla.App.1979) (requiring detrimental reliance under Oklahoma law). Witters entered into the February Settlement on the basis of the quote provided by Rask. Although the evidence is murky as to whether the February Settlement was binding on Pacific, or whether Pacific would have settled the case for a lower amount had not Rask relayed the faulty quote,[6] we cannot state, as a matter of law, that Twin City did not "change its position" in reliance on the quote. This determination should be made by the trier of the fact.
 
 2. Negligence
 
 73
 Under Oregon law, to state a cause of action for negligence, the plaintiff must show:
 
 
 74
 (1) a legal duty of care,
 
 
 75
 (2) a breach thereof,
 
 
 76
 (3) damage to plaintiff which was proximately caused by the breach.
 
 
 77
 See, e.g., Brennen v. City of Eugene, 285 Or. 401, 405, 591 P.2d 719, 722 (1979) (en banc); Stout v. Madden, 208 Or. 294, 309, 300 P.2d 461, 468 (1956), overruled on other grounds, Kuhns v. Standard Oil Co., 257 Or. 482, 478 P.2d 396 (1970).
 
 
 78
 Twin City clearly presented substantial evidence on the elements of duty and breach of duty. See, e.g., Joseph Forest Products, 278 Or. at 480, 564 P.2d at 1029; Ritchie v. Smith, 311 So.2d 642, 643 (Miss.1975) (broker's failure to investigate insurance availability states prima facie case). Although the issue is close, we also hold that Twin City presented substantial evidence on the elements of causation and damage. Under the "but for" or "sine qua non" formulation of causation, the "defendant's conduct is a cause of the event if the event would not have occurred but for that conduct; conversely, the defendant's conduct is not a cause of the event, if the event would have occurred without it." W.P. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton On Torts Sec. 41, at 266 (5th ed. 1984) [hereinafter Prosser & Keeton ]. See also Sworden v. Gross, 243 Or. 83, 86, 409 P.2d 897, 898 (1966); Smelser v. Pirtle, 242 Or. 294, 297, 409 P.2d 340, 341 (1965). The damage element requires that the "event" for which the plaintiff seeks redress have caused a pecuniary injury. See, e.g., Richards v. City of Lawton, 629 P.2d 1260, 1263 (Okla.1981); Prosser & Keeton, supra Sec. 30, at 165.
 
 
 79
 The "event" for which Twin City seeks redress is its expenditure of the additional $260,000 in settling Powell's claim. Twin City argues that Rask negligently relayed the Philadelphia Life quote, and that Twin City was therefore "injured" in the amount of $260,000 (by Rask's failure to fulfill his promise to deliver the Philadelphia Life annuity). However, the Oregon courts have recognized that "recovery for tortious injury is intended to restore the injured party to the position it enjoyed before the injury or to compensate the injured party for its loss." See, e.g., McKee Electric Co. v. Carson Oil Co., 70 Or.App. 1, 7-8, 688 P.2d 1360, 1366 (emphasis added), review granted, 298 Or. 334, 691 P.2d 482 (1984). See also Hahn v. Atlantic Richfield Co., 625 F.2d 1095, 1104 (3d Cir.1980), cert. denied, 450 U.S. 981, 101 S.Ct. 1516, 67 L.Ed.2d 816 (1981); Nobriga v. Raybestos-Manhattan, Inc., 67 Hawaii 157, ----, 683 P.2d 389, 393 (1984). That Twin City may have been denied its "benefit of the bargain" does not satisfy the damage and causation requirements for negligence. As the drafters of the Restatement Second explained, "[w]hile the law of contracts gives to a party to a contract as damages for its breach an amount equal to the benefit he would have received had the contract been performed ..., the law of torts attempts primarily to put an injured person in a position as nearly as possible equivalent to his position prior to the tort." Restatement (Second) of Torts Sec. 901 Comment a (1977); Id. Sec. 903 Comment a.
 
 
 80
 Twin City must demonstrate, therefore, that Rask's relay of the Philadelphia Life quote placed it in a worse position than it occupied before Pacific entered into the February Settlement, and that it suffered a pecuniary injury as a proximate result of Rask's conduct.
 
 
 81
 Before Rask conveyed the quote, it appears Pacific had conceded liability to Powell and thus already owed him an unliquidated amount. As a practical matter, the debt already existed. Only the sum was uncertain. If Rask had never quoted the Philadelphia Life annuity, Pacific (and Twin City) may have settled the case for more than $2 million. By the same token, Rask's conveyance of the Philadelphia Life quote did not necessarily increase Pacific's or Twin City's costs of settlement. Powell had consistently insisted upon a combination of cash and annuities such as that ultimately agreed upon by the parties. The parties acknowledge that the Philadelphia Life annuity could not be written in Oregon or used in the Powell settlement. As noted, Pacific had already decided to settle Powell's claim before Rask conveyed the faulty quote. These factors, in the aggregate, could lead one to concede that the Philadelphia Life quote and the February Settlement had no effect on Pacific's and Twin City's costs of settlement.
 
 
 82
 The opposite may also be true. Prior to the February Settlement, the cost of Pacific's and Twin City's most generous offer was $1.6 million. The parties agree they were "close" to a settlement on the basis of that offer. If Twin City and Pacific had not entered into the arguably binding February Settlement, which might not have occurred "but for" the Philadelphia Life quote, they might have been able to settle the Powell case on the basis of the offer costing $1.6 million or something close to that. There is evidence that the offer of the Philadelphia Life annuity, prompted by the quote relayed by Rask, increased Powell's settlement expectations and made settlement at a lower figure thereafter unlikely if not impossible. The following testimony by Powell's attorney at trial illustrates this:Q. Alright. If they had never made the settlement offer which involved these deferred annuities, do you think a settlement could have been reached?
 
 
 83
 A. [Mr. Goff, Powell's attorney] I have no way of knowing.
 
 
 84
 Q. So it's purely speculative whether if they hadn't given you those deferred annuity quotes a settlement might or might not have been reached?
 
 
 85
 A. That's correct.
 
 
 86
 Q. And but once, of course, they made that offer of those deferred annuities, then you weren't going to take anything less?
 
 
 87
 A. That's correct.
 
 
 88
 Q. And going into the February 7th meeting, or the week before, at that time you and Mr. Powell set any bottom line on the minimum that you were going to accept to settle this claim?
 
 
 89
 A. No.
 
 
 90
 Finally, there is also evidence in the record that alternative and comparable annuities might have been available at the time Rask relayed the quote for the Philadelphia Life annuity, which could have been located for Pacific at the time the February Settlement was being negotiated, but which were not available later on. Rask's failure, if any, to search out and report to Pacific the availability of other comparable annuities could serve as a basis for imposing damages for negligence.
 
 
 91
 We believe these matters present questions which should be resolved by the trier of fact and decline to resolve them as a matter of law.
 
 C. Rask's Claim for Indemnity from Griffith
 
 92
 Rask seeks relief by way of indemnity from Griffith and St. Paul if he is held accountable to Twin City for damages. The district court held that Rask had failed to raise a jury issue on his indemnity claims. We disagree.
 
 
 93
 Under Oregon law, recovery by indemnity requires proof of three elements:
 
 
 94
 1. Discharge of a legal obligation owed by the payor to a third person.
 
 
 95
 2. The person against whom indemnity is claimed must also be liable to the third person.
 
 
 96
 3. As between the claimant payor and the person against whom indemnity is claimed, the obligation ought to be discharged by the latter.
 
 
 97
 See, e.g., Ore-Ida Foods, Inc. v. Indian Head Cattle Co., 290 Or. 909, 919-20, 627 P.2d 469, 475 (1981).
 
 
 98
 Rask presented substantial evidence to obtain indemnity from Griffith and St. Paul. The evidence indicates that Rask used Griffith's services because of his expertise in obtaining information about annuities, and that Griffith had been actively engaged in the structured settlement business on a full-time basis since 1979. Griffith was an agent for St. Paul and a general agent for Philadelphia Life. He knew that Rask was requesting quotes on annuities for use in the Powell case. Griffith provided Rask with various quotes from Philadelphia Life over a period of nearly a year, but never informed Rask or Witters (through Rask) that Philadelphia Life did not write deferred annuities in Oregon. Rask also testified that Griffith told him he was "comfortable" with the Philadelphia Life quote. Griffith informed Rask that the Philadelphia Life annuity was not available only after Rask had relayed the quote to Witters. This constitutes substantial evidence both that Griffith may have been negligent and that, as between Rask and Griffith, liability should fall on the latter.[7] See generally Ritchie, 311 So.2d at 643 (failure to investigate availability of insurance states prima facie case). See also Reding v. Texaco, Inc., 598 F.2d 513, 520-21 (9th Cir.1979) (question of negligence in indemnity presented jury question); Lipman Wolfe & Co. v. Teeples & Thatcher, Inc., 268 Or. 578, 588-89, 522 P.2d 467, 471-72 (1974) (indemnity may be available where party used services of third party); Kennedy v. Colt, 216 Or. 647, 654-55, 339 P.2d 450, 453-54 (1959) (same). This issue should not have been decided as a matter of law in favor of either party.
 
 
 99
 D. Attorney's Fees Against Philadelphia Life
 
 
 100
 Finally, we consider Twin City's contention that the district court erred in entering summary judgment against it on its claim for attorney's fees against Philadelphia Life. Twin City argues that Rask was an agent for Philadelphia Life and that Or.Rev.Stat. Sec. 743.114 (1985) entitles Twin City to attorney's fees. We hold that the district court properly entered summary judgment against Twin City on its claim for attorney's fees.
 
 Section 743.114 provides that:
 
 101
 If settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon....
 
 
 102
 Or.Rev.Stat. Sec. 743.114 (1985).
 
 
 103
 The Oregon courts apparently have not addressed whether a plaintiff may obtain recovery from an insurer where an agent fails to procure a policy of insurance and a plaintiff, after suffering a loss, makes a claim on the requested policy. See Monsantofils v. Gacek Insurance Agency, 282 Or. 3, 7, 576 P.2d 789, 791 (1978) (denying recovery from an agent but not addressing liability of insurer). We need not address this general issue. We only hold that in this case Twin City has not presented a claim on a policy for payment of benefits. Rather, Twin City seeks damages for the added expense in procuring an alternative annuity. We do not believe that Section 743.114 reaches these facts and entitles Twin City to attorney's fees.[8]
 
 V
 CONCLUSION
 
 104
 We affirm the district court's denial of Rask's motions for directed verdict on Twin City's breach of contract, promissory estoppel and negligence claims. We also affirm the district court's entry of summary judgment in favor of Philadelphia Life on Twin City's claim for attorney's fees. We reverse the district court's entry of directed verdict in favor of Twin City on its breach of contract claim against Rask, and in favor of Griffith and St. Paul on Rask's claims for indemnity. We also hold that Rask presented a genuine issue of material fact on the defenses of mistake and impossibility and that he should have been permitted to raise these defenses in the trial court.
 
 
 105
 AFFIRMED IN PART, REVERSED IN PART, REMANDED.
 
 
 
 [1]
 We discuss "benefit of the bargain" damages in greater detail infra. Our conclusion that the "insurance procurement" cases protect a plaintiff's "reliance" interest and not the "expectation" interest finds support in the Restatement Second of Contracts. See Restatement (Second) of Contracts Sec. 90, Comment e (1979) (liability should only be imposed where there is actual reliance) [hereinafter Restatement Contracts ]. The distinction between "reliance" and "expectation" damages is discussed in Fuller and Perdue, The Reliance Interest in Contract Damages (Pt. 1), 46 Yale L.J. 52 (1936) (passim)
 
 
 [2]
 In Oney, the court stated that:
 The liability of an insurance agent or broker to his principal depends upon the nature of the contract between them. Derby v. Blankenship, 217 Ark. 272, 230 S.W.2d 481, 482 (1950). An agent may unconditionally contract to provide insurance, and if he fails to do so, the agent may be liable for the resulting loss from his breach of contract [citation omitted], or, the broker or agent may make himself liable under a contract requiring the agent to act in good faith and with reasonable diligence to secure insurance for his principal. [citations omitted]. As to this latter type of contract the agent is held liable to his principal if, on failing to secure insurance, he does not promptly notify his principal of this fact and a loss occurs which is uninsured because of such failure to notify.
 Id. 5 Ariz.App. at 462, 428 P.2d at 126.
 
 
 [3]
 As Holmes stated, "when people make contracts, they usually contemplate the performance rather than the breach...." O. Holmes, The Common Law 302 (1881). The Oregon courts have stated that one of the purposes of a "contract is to shift reasonably foreseeable business risks to the party promising the performance so that the promisee can devote his energies and capital to other matters." Savage v. Peter Kiewit Sons' Co., 249 Or. 147, 153, 432 P.2d 519, 522-23 (1967), modified, 249 Or. 158, 437 P.2d 487 (1968). Courts impose damages, in part, to encourage promisees to rely on promises. E. Farnsworth, Contracts Sec. 12.1, at 811-13 (1982). This purpose is not served by requiring an agreement between the parties to impose damages. J. Calamari & J. Perillo, Contracts Sec. 14-5, at 524-25 (1977). Indeed, most jurisdictions have also held that the imposition of consequential damages does not require a "tacit" agreement between the parties to impose liability. See, e.g., R.I. Lampus Co. v. Neville Cement Products Corp., 474 Pa. 199, 206-10, 378 A.2d 288, 290-93 (1977)
 
 
 [4]
 Compare Alcoa S.S. Co. v. Ryan, 211 F.2d 576, 578 (2d Cir.1954) ("federal practice" is that mistake is non-jury issue); United States v. Pyle, 248 F.Supp. 40, 44 (E.D.Okla.1965) (same); Mutual of Enumclaw Insurance Co. v. Wood By-Products, Inc., 107 Idaho 1024, 1026-27, 695 P.2d 409, 412 App. (1984); and In re Marriage of Deines, 44 Colo.App. 98, 101, 608 P.2d 375, 380 (1980) (mistake presents question of fact). As to the defense of impossibility, the Restatement Second indicates that this is a question of law for the court. See Sunflower Electric Cooperative v. Tomlinson Oil Co., 7 Kan.App.2d 131, 138, 638 P.2d 963, 969 (1981) (quoting from Restatement commentary). And "[I]n diversity cases, whether an issue is one of law for the court to decide or one of fact for the jury to determine is governed by federal law." Deland v. Old Republic Life Insurance Co., 758 F.2d 1331, 1335 (9th Cir.1985). But whether defenses of mistake and impossibility must be coupled with a request for equitable relief (i.e., rescission) may present a question of state law. But see generally State v. Kook, 14 Or.App. 594, 513 P.2d 1189 (1973). These citations are given only for the purpose of providing a possible starting point for consideration of the issue. They are by no means exhaustive and are not meant to suggest how the issue should be resolved
 
 
 [5]
 The parties have not addressed whether a plaintiff is entitled to present the claim of promissory estoppel to a jury. We therefore do not address this issue
 
 
 [6]
 We discuss this issue hereafter in the context of "causation" and "damage" for the purposes of Twin City's negligence claim
 
 
 [7]
 Because we hold that Rask presented substantial evidence under the theory of negligence, we need not address any other theories for indemnification which he may advance
 
 
 [8]
 We therefore need not address whether Rask was an agent of Griffith or Philadelphia Life. Further, because we reverse the district court's entry of judgment in favor of Twin City, we need not address whether Twin City is entitled to pre-judgment interest on its breach of contract claim